[No. S034554. Nov. 17, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKY LEE BROWN, Defendant and Appellant.

**COUNSEL**

Eleanor M. Kraft, under appointment by the Supreme Court, and Rudy Kraft for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Michael J. Weinberger and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

Lloyd M. Harmon, Jr., County Counsel (San Diego), Susan Strom, Chief Deputy County Counsel, Gary C. Seiser and Patti L. Dikes, Deputy County Counsel, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**GEORGE, J.**—Historically, under the common law fresh-complaint doctrine, evidence that the alleged victim of a sexual offense disclosed or reported the incident to another person shortly after its occurrence has been held admissible, as part of the prosecution's case-in-chief, in a subsequent criminal prosecution for that offense. In California, the governing decisions have explained that the victim's extrajudicial "complaint" is admissible for a limited, nonhearsay purpose—namely, simply to establish that such a complaint was made—in order to forestall the trier of fact from inferring erroneously that no complaint was made, and from further concluding, as a result of that mistaken inference, that the victim in fact had not been

sexually assaulted. (See, e.g., *People* v. *Burton* (1961) 55 Cal.2d 328, 351 [11 Cal.Rptr. 65, 359 P.2d 433].)[1]

In the case before us, defendant, initially asserting that the fresh-complaint doctrine is based upon false, outdated assumptions and misconceptions relating to the reactions of victims of sexual offenses, urges us to abolish this common law rule traditionally applicable in sexual offense cases. Defendant further contends that, even if the fresh-complaint doctrine remains viable, evidence of the victim's out-of-court statements in the present case was not properly admissible under that doctrine, because the victim, a 12-year-old girl, did not voice the complaint promptly, and, when she ultimately did report the incidents, made the complaint only in response to questioning by an adult friend.

In recent years, the continuing validity of the fresh-complaint doctrine has been questioned by a number of legal scholars and commentators. As recognized by courts in other jurisdictions, the validity of one of the historic premises of the doctrine—that it is natural for the victim of a sexual offense promptly to disclose the incident if it actually occurred—has been eroded substantially in contemporary times by numerous empirical studies. Upon reexamining its theoretical underpinnings, we conclude that the fresh-complaint doctrine, *as traditionally defined*, no longer provides a sound basis for the admission of evidence of extrajudicial statements made by the victim of a sexual offense in reporting the alleged crime.

At the same time, however, we conclude that—setting aside the outdated notions upon which the doctrine traditionally has rested—the limited, non-hearsay evidence that in the past has been admitted under the fresh-complaint doctrine nonetheless is, in most instances, properly admissible at trial under generally applicable evidentiary standards.

Accordingly, we conclude that the formulation and parameters of the fresh-complaint doctrine, as applied in this state, should be revised to reflect a more accurate understanding of the proper basis for the admission of such evidence. As we shall explain, we conclude that, *under principles generally applicable to the determination of evidentiary relevance and admissibility*, proof of an extrajudicial complaint, made by the victim of a sexual offense,

---

[1]Such extrajudicial statements also may be admissible for a hearsay purpose (i.e., to prove the truth of the content of the statement) under an exception to the hearsay rule (e.g., as a spontaneous declaration [Evid. Code, § 1240] or as evidence of prior identification [Evid. Code, § 1238]), provided the requirements for their admission under that exception are satisfied in the particular case. In the present case, the prosecution did not offer the evidence of the minor's complaint for a hearsay purpose, and we therefore do not address the question of the admissibility of a victim's extrajudicial statements for hearsay purposes.

disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred. Under such generally applicable evidentiary rules, the timing of a complaint (e.g., whether it was made promptly after the incident or, rather, at a later date) and the circumstances under which it was made (e.g., whether it was volunteered spontaneously or, instead, was made only in response to the inquiry of another person) are not necessarily determinative of the admissibility of evidence of the complaint. Thus, the "freshness" of a complaint, and the "volunteered" nature of the complaint, should not be viewed as essential prerequisites to the admissibility of such evidence.

Therefore, in the present case, we conclude the trial court properly admitted evidence of the victim's complaint, which was narrowly limited to the fact of, and the circumstances surrounding, her disclosure of the alleged sexual molestation. Accordingly, we affirm the judgment of the Court of Appeal, upholding the conviction.

## I

The minor, Audrey S., was born on January 19, 1978. Her mother, Martina S., met defendant Ricky Lee Brown in 1984 and became intimately involved with him. From August 1984 through May 1990, Martina and Audrey resided with defendant, changing residences on numerous occasions. Throughout this period, Martina was employed outside the home and defendant, who received disability payments, remained at home.

At trial, Audrey testified that one night in 1985, when Martina was absent and Audrey was alone with defendant in a bedroom, he pulled her by the hand toward the bed and told her to undress. He then undressed and attempted to place his penis inside her vagina but was unable to do so. When Martina returned, Audrey did not mention the incident, because she was frightened. From 1985 through 1986, approximately six or seven similar incidents occurred, during which defendant attempted sexual intercourse and placed his mouth upon Audrey's vagina.

From November 1986 through June 1987, Martina, Audrey, and Martina's newly born daughter, Angelina, resided with defendant at another residence. According to Audrey's testimony, the incidents of molestation continued. In June 1987, and again in May 1988, the family changed residences, during which period Martina's third daughter, Amanda, was born. Additional incidents of molestation occurred. Audrey testified that, when she was alone

with defendant, he frequently placed his penis and his finger inside her vagina and placed his mouth upon her vagina. Defendant told Audrey she never should disclose these incidents, because people would think poorly of her.

In August 1989, the family again moved to another apartment, where they resided until May 1990. During this period, Audrey attended the sixth grade of the local elementary school. On approximately six or seven occasions, when Audrey returned home from school, defendant placed his penis and his finger inside her vagina, placed his mouth upon her vagina, and asked her to touch his penis.

In May 1990, Martina and Audrey moved to another apartment and no longer resided with defendant. Audrey testified that, approximately one month before her sixth grade graduation, which took place in June 1990, she told her best friend, Maria Maisonet, about the incidents of molestation because she "was scared and wanted to tell somebody."

Audrey spent the summer of 1990 with Diana Russell and Diana's husband, Fernando Russell, with whom Martina had had a prior relationship and whom Audrey considered her adoptive father. Audrey testified that Diana Russell was the first adult whom she told about "this," referring to the molestation. Defense counsel objected to this testimony and, outside the presence of the jury, argued that the testimony concerning the victim's extrajudicial statements was not admissible under the fresh-complaint doctrine, because Audrey did not complain immediately following the last incident of molestation. The prosecutor responded that Audrey's testimony was not being offered as a fresh complaint but simply for the purpose of "establishing when this witness finally decided to tell someone in authority so that the molest allegation could be finally gotten to law enforcement. . . . If I'm not allowed to ask this witness who she finally disclosed to, it's going to be a huge mystery to the jury how we're sitting here today other than that she told her friend and told her friend not to tell anybody." The trial court overruled the defense objection to the admission of this evidence.

Thereafter, in the presence of the jury, on direct examination, Audrey testified that the first adult in whom she confided regarding the alleged molestation was her "stepmom," Diana Russell. The following colloquy took place between the prosecutor and Audrey: "[Prosecutor:] How soon was it

after you told Martha (verbatim)[2] you told Diana Russell? . . . [¶] [Audrey:] About two or three months after. [¶] [Prosecutor:] And why did you tell Diana Russell? [¶] [Audrey:] Well, we were talking. And she sort of pried it out of me. . . . [¶] [Prosecutor:] Did you intend to tell Miss Russell? [¶] [Audrey:] No. [¶] [Prosecutor:] Why did you tell her? [¶] [Audrey:] Why? [¶] [Prosecutor:] Do you know? Do you remember? [¶] [Audrey:] No. [¶] [Prosecutor:] What was your emotional condition like when you told her about it? [¶] [Audrey:] Scared. [¶] [Prosecutor:] Why is that? [¶] [Audrey:] Because at the time I had—I didn't want to tell anybody, least of all my mom. [¶] [Prosecutor:] And why is that? [¶] [Audrey:] Well, because I knew if I told my stepmother she would have told my mom and tell my sisters. And I just didn't want anything to go wrong. . . . [¶] [Prosecutor:] What did you do after you disclosed to the adult what happened? [¶] [Audrey:] I decided to tell my mom. [¶] [Prosecutor:] And did you eventually tell your mom? [¶] [Audrey:] Yes. [¶] [Prosecutor:] Was it the same day or later? [¶] [Audrey:] No. It was later. [¶] [Prosecutor:] And after you told your mom did you go see anybody about the disclosure? [¶] [Audrey:] Yes."

After Audrey testified further that she then spoke to another woman, the prosecutor asked Audrey whether she told the woman "all the things that happened . . .?" Audrey replied affirmatively and testified that she then told two police officers "what had happened" and related to a detective "everything that happened."

Diana Russell testified that one evening during the three-month period in which Audrey resided with the Russells, Ms. Russell engaged Audrey in conversation: "[Prosecutor:] And how long had—Audrey been staying with you when you became involved in this conversation? [¶] [Russell:] Between five and six weeks. [¶] [Prosecutor:] Okay. And during that conversation— strike that. At the beginning of the conversation—what was Audrey's emotional condition like at the beginning? [¶] [Russell:] Withdrawn. . . . [¶] [Prosecutor:] Was she talking to you freely during that conversation? [¶] [Russell:] No. [¶] [Prosecutor:] During the course of the conversation did her emotional condition change? [¶] [Russell:] Yes, it did. [¶] [Prosecutor:] And how did it change? [¶] [Russell:] She got very—she was crying. She—she— well, she was—all I can say is she was withdrawn, very, very withdrawn. . . . [¶] [Prosecutor:] And about how long did this whole conversation take? [¶] [Russell:] About three hours. [¶] [Prosecutor:] Okay. During that three hours was she offering information to you? [¶] [Russell:] No. [¶] [Prosecutor:] Would you say that she was reluctant to give you information?

---

[2]The notation in parentheses apparently reflects the reporter's indication that the reference to "Martha" is to Maria Maisonet.

[¶] [Russell:] Yes. [¶] [Prosecutor:] By the end of her conversation what was her condition like? [¶] [Russell:] She was just clinging to me. She just wouldn't let me go. She was crying very hard."

On one occasion during the summer of 1990, defendant arrived at the residence of Maria Maisonet and spoke to Maria's father, Julian. Defendant told Julian that Maria had no business testifying against him, because she was unaware of what had transpired between Audrey and defendant. Defendant threatened that something would happen to Julian's family in the event Maria testified against him.

On August 2, 1990, Dr. Mitri Choudri, a pediatrician, examined Audrey, then 12 years of age, for evaluation of possible sexual assault. Examining the vaginal area, Dr. Choudri observed the hymen was torn into fragments. The physician did not testify on direct examination as to whether this condition was consistent with sexual assault, but on cross-examination testified that it was consistent with Audrey's having masturbated or used tampons, or with other circumstances apart from sexual intercourse.

Approximately four months later, in December 1990, Cathy Boyle, a pediatric nurse who was qualified as an expert in the detection of sexual abuse of children, examined Audrey. She testified that Audrey's hymen was "normal" but had characteristics consistent with a history of both digital and penile contact. She explained that hymen tissue expands, contracts, and heals quickly, and that 60 percent of molested children do not demonstrate "any physical findings" of molestation.

The defense presented evidence tending to show that defendant had had a normal relationship with Audrey, who had referred to him as "dad" or "daddy." According to defense witnesses, Audrey had resented having the occasional responsibility of babysitting for her two younger sisters and, therefore, had complained of defendant mistreating her. Martina acknowledged that Audrey had stated on several occasions that she hated defendant. The defense also presented evidence that, during defendant's tempestuous relationship with Martina S., Martina filed two requests for temporary restraining orders. Defendant's aunt testified that Martina had neglected Audrey and at times had forced her to do things she did not wish to do, such as tell a lie.

The jury found defendant guilty of nine counts of lewd and lascivious conduct with a child under fourteen years of age (Pen. Code, § 288, subd. (a)). The jury also found true, with respect to two counts, allegations of substantial sexual conduct with a victim under eleven years of age (Pen.

Code, § 1203.066, subd. (a)(8)), and, with respect to six counts, allegations of substantial sexual conduct while occupying a position of special trust (Pen. Code, § 1203.066, subd. (a)(9)). Defendant was sentenced to a prison term of 26 years.

On appeal, defendant challenged the admission of Audrey's and Diana Russell's testimony relating to Audrey's out-of-court statements to various individuals, disclosing incidents of sexual molestation. Defendant argued that these statements did not qualify as fresh complaints, because they were not made closely following the last incident of molestation and were not volunteered, instead having been elicited in response to Russell's probing questions. The Court of Appeal upheld the admission of the challenged testimony under the fresh-complaint doctrine and affirmed the judgment. The court concluded the complaints were "fresh," because the victim's delay in disclosing the incidents of molestation was reasonable under the circumstances of the case, and her statements maintained the characteristics of a complaint even though their disclosure initially was elicited by questioning from an adult who observed the victim to be in distress. In reaching this conclusion, the court expressly disagreed with *In re Cheryl H.* (1984) 153 Cal.App.3d 1098 [200 Cal.Rptr. 789], a decision holding that, to qualify as a fresh complaint, an out-of-court statement must have been made "within a reasonable time" following the incident in question and not in response to questioning.

We granted review to reexamine the fresh-complaint doctrine and to resolve the conflict between the appellate court decisions in the present case and in *In re Cheryl H., supra,* 153 Cal.App.3d 1098, relating to the admissibility of evidence under the fresh-complaint doctrine.

## II

The fresh-complaint doctrine originated with the 13th-century rule of "hue and cry," which required victims of rape and other violent crimes to alert the community immediately following the commission of the crime. Under this ancient rule, a victim's extrajudicial "complaint" was a necessary element of, and therefore admissible as part of, the prosecution's case-in-chief. (See 4 Wigmore, Evidence (Chadbourn ed. 1972), § 1134, pp. 297-298 [hereafter Wigmore]; Note, *The Admissibility of Extrajudicial Rape Complaints* (1984) 64 B.U.L. Rev. 199, 204-205 [hereafter *Extrajudicial Rape Complaints*].)

In the 1800's, courts developed the hearsay rule, barring the admission in evidence of statements made by witnesses out of court, to prove the truth of the matter asserted. (2 McCormick, Evidence (4th ed. 1992) § 244, p. 90.) In

rape cases, however, the "hue and cry" rule was replaced by the fresh-complaint doctrine, permitting admission of evidence of the fact that the victim had complained of a sexual assault, while excluding the details of the complaint. (See *Extrajudicial Rape Complaints, op. cit. supra*, 64 B.U.L. Rev. at pp. 205-206.) In articulating this doctrine, courts adhered to the prevailing assumption that it was natural for a woman to confide in someone immediately following a sexual assault, and that if she failed to complain or display any signs of having been assaulted, the only rational explanation was that no offense had been committed.[3] The courts reasoned that, in the absence of evidence of a victim's prompt complaint, the jury might be left with the impression that the victim had remained silent, and, as a result, tend to doubt the veracity of her present testimony. Wigmore explains the theory as follows: "[W]here nothing appears on the trial as to the making of such a complaint, the jury might naturally assume that none was made . . . . As a peculiarity, therefore, of this kind of evidence, it is only just that the prosecution should be allowed to forestall this natural assumption by show-ing that the woman was *not silent*, i.e., that *a complaint was in fact made*." (4 Wigmore, *op. cit. supra*, § 1135, at pp. 298-299, fns. omitted, italics in original.)

Since the 19th century, California courts have relied upon the fresh-complaint doctrine to support the admission of a complaint made by the victim of an alleged sexual offense, but only for a nonhearsay purpose, i.e., not to prove the truth of the content of the victim's statement but, rather, simply to show that a prompt complaint was made. (See, e.g., *People* v. *Mayes* (1885) 66 Cal. 597 [6 P. 691]; *People* v. *Baldwin* (1897) 117 Cal. 244, 251 [49 P. 186]; *People* v. *Swist* (1902) 136 Cal. 520, 523-524 [69 P. 223]; *People* v. *Wilmot* (1903) 139 Cal. 103, 105 [72 P. 838] ["It is well settled that in prosecutions for rape the people may prove that the injured party *made complaint of the injury* while it is recent, and that this may be shown both by the prosecutrix and those to whom the complaint is made. While such evidence would ordinarily be hearsay, its admission in this class of cases is justified upon the ground that in such cases, when restricted to the *fact of complaint*, it is in the strictest sense original evidence." (Italics in original.)].)[4]

In *People* v. *Burton, supra*, 55 Cal.2d 328, at page 351, this court set forth as follows the formulation and justification of the fresh-complaint doctrine,

---

[3]See, e.g., *Baccio* v. *People* (1869) 41 N.Y. 265, 268 ("[I]t is so natural as to be almost inevitable that a female upon whom the crime has been committed will make immediate complaint thereof to her mother or other confidential friend . . . ."); *State* v. *Neel* (1900) 21 Utah 151 [60 P. 510, 511] ("The natural instinct of a female thus outraged and injured prompts her to disclose the occurrence, at the earliest opportunity, to the relative or friend who naturally has the deepest interest in her welfare . . . .").

[4]Numerous other jurisdictions recognize the fresh-complaint doctrine. (See, e.g., *State* v. *Pollitt* (1987) 205 Conn. 61 [530 A.2d 155]; *Battle* v. *U.S.* (D.C.App. 1993) 630 A.2d 211;

thereafter relied upon in numerous appellate decisions: "In a case . . . where the nonconsenting victim of a sex offense testifies to its commission, the theory of admissibility of evidence of a complaint which is consistent with her testimony and which is not a spontaneous declaration which might be excepted from the hearsay objection is this: It is natural to expect that the victim of a crime would complain of it, and the prosecution can show the fact of complaint to forestall the assumption that none was made and that therefore the offense did not occur." *Burton* clarified that the "fact of complaint" did not include details of the incident, but did include evidence demonstrating that the complaint " '*related to the matter being inquired into, and [was] not a complaint wholly foreign to the subject . . . .* ' " (*Ibid.*, italics in original.)

Since our decision in *People* v. *Burton, supra*, 55 Cal.2d 328, in cases involving sexual offenses committed against minors, California courts consistently have upheld the admission of the victim's out-of-court statements, disclosing the commission of sexual abuse, under the fresh-complaint doctrine. (See, e.g., *People* v. *Snyder* (1993) 14 Cal.App.4th 1166, 1173 [18 Cal.Rptr.2d 496]; *People* v. *Fair* (1988) 203 Cal.App.3d 1303, 1307-1308 [250 Cal.Rptr. 486]; *People* v. *Clark* (1987) 193 Cal.App.3d 178, 181-182 [238 Cal.Rptr. 230]; *People* v. *Meacham* (1984) 152 Cal.App.3d 142, 158 [199 Cal.Rptr. 586].) These decisions cite the rule, articulated in the *Burton* decision, that such evidence is admissible only to show that a complaint was made by the victim, and not for the truth of the matter asserted.

Historically, to be admissible under the doctrine, the complaint must have been truly "fresh" or "recent," under the rationale that, if not volunteered promptly following commission of the offense, the complaint no longer could negate legitimately the inference that the victim had remained silent in the aftermath of the alleged offense. (See 4 Wigmore, *op. cit. supra*, § 1135, at p. 301.) Reiterating this rule, in *In re Cheryl H., supra*, 153 Cal.App.3d 1098, the court held that verbal statements made by the minor victim of sexual abuse to her physician one to two months after the occurrence of the molestation were not admissible under the fresh-complaint doctrine, because they were not volunteered "within a short time" following the sexual abuse. (*Id.*, at p. 1129; cf. *People* v. *Clark, supra*, 193 Cal.App.3d 178, 182 [". . . once [the minor] became aware of what had happened to her, she promptly

*People* v. *Lawler* (1991) 142 Ill.2d 211 [154 Ill.Dec. 674, 568 N.E.2d 895]; *Commonwealth* v. *Licata* (1992) 412 Mass. 654 [591 N.E.2d 672]; *People* v. *Vaughn* (1977) 75 Mich.App. 540 [255 N.W.2d 677]; *State* v. *Hill* (1990) 121 N.J. 150 [578 A.2d 370]; *People* v. *McDaniel* (1993) 81 N.Y.2d 10 [595 N.Y.S.2d 364, 611 N.E.2d 265]; *State* v. *Baker* (1980) 46 Ore.App. 79 [610 P.2d 840]; *Commonwealth* v. *Freeman* (1982) 295 Pa.Super. 467 [441 A.2d 1327]; *Simpkins* v. *State* (1991) 303 S.C. 364 [401 S.E.2d 142], 143; *State* v. *Murley* (1949) 35 Wn.2d 142 [212 P.2d 801].)

made the complaint. Therefore, the complaint was 'fresh' in the sense of [her] cognizance and, in light of the rationale behind this doctrine, was properly admitted"]; *People* v. *Meacham,* 152 Cal.App.3d 142, 158-159 [one-month delay in reporting sexual abuse of child affected only weight and not admissibility of evidence].)

Because of the limited purpose for which the out-of-court statements of victims may be admitted as fresh complaints, past cases have held that the trial court upon request must instruct the jury to consider such evidence only for the purpose of establishing that a complaint was made, so as to dispel any erroneous inference that the victim was silent, but not as proof of the truth of the content of the victim's statement. (See *People* v. *Meacham,* 152 Cal.App.3d 142, 158; *People* v. *Brown* (1973) 35 Cal.App.3d 317, 324 [110 Cal.Rptr. 854]; *Extrajudicial Rape Complaints, op. cit. supra,* 64 B.U.L. Rev. at pp. 209-210.) In the present case, defense counsel did not request, and the trial court did not provide, any such limiting instruction. (See *People* v. *Clark,* 193 Cal.App.3d 178, 182-183 [court has no duty, absent a request, to provide limiting instruction].)

### III

█ Defendant urges that continued judicial reliance upon the fresh-complaint doctrine is unwarranted. In recent years, the validity of the doctrine has been questioned and reexamined by several out-of-state courts as well as by legal commentators.[5] (See, e.g., *Commonwealth* v. *Licata, supra,* 591 N.E.2d at p. 674 [the court expressed the concern that the fresh-complaint doctrine has its origins in outmoded and invalid sexual myths]; *State* v. *Hill, supra,* 578 A.2d at p. 380 [fresh-complaint doctrine has a "misguided history," and originated in "sexist notions of how the 'normal' woman responds to rape"].) In his Evidence Benchbook, Jefferson urges

---

[5]"The continued validity of the [fresh-complaint doctrine based upon the hue and cry theory] rests entirely on the assumption that it is 'natural' for a rape victim to complain immediately after the assault. A presumption of naturalness may not have been unreasonable in thirteenth-century England, where society required an early complaint. It was also arguably 'natural' for male-dominated, nineteenth-century American society to expect women to turn to others for support once violated. These expectations are, however, much more difficult to substantiate in modern society, where the psychological question of whether it is natural for a rape victim to complain remains open." (*Extrajudicial Rape Complaints, op. cit. supra,* 64 B.U.L. Rev. at pp. 210-211, fns. omitted.)

Another commentator notes: "In today's world, the [ancient 'hue and cry' requirements] seem outrageously insensitive to the emotions of a victim of rape. It seems likely that a rape victim may desire to tell as few people as possible, rather than raise the hue and cry throughout the community." (Myers, Child Witness Law and Practice (1987) § 5.34, p. 345, fn. 394 [citing authority indicating that a substantial percentage of rapes go unreported or are delayed in being reported because the victim is ashamed or fearful that she will not be believed].)

rejection of the doctrine, expressing concern that "evidence of a sex victim's complaint will necessarily be used by the jury as *hearsay*—as proof of the truth of the hearsay statement that defendant was the perpetrator of the offense." (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 2d ed. 1982) § 1.1, p. 12.)

Indisputably, one of the historic premises of the doctrine—that it is natural for the victim of a sexual assault to complain promptly following the assault—has been discredited substantially in contemporary times. The overwhelming body of current empirical studies, data, and other information establishes that it is *not* inherently "natural" for the victim to confide in someone or to disclose, immediately following commission of the offense, that he or she was sexually assaulted. (See, e.g., Lizotte, *The Uniqueness of Rape: Reporting Assaultive Violence to the Police* (1985) 31 Crime & Delinquency 169, 169-190 [noting that the consensus among researchers is that rape is vastly underreported, and analyzing factors motivating or deterring the reporting of rape]; Meyers, *The Legal Response to Child Abuse* (1985) 24 J. Fam. L. 149, 169-172, 181-184 [noting that sexual abuse of children is considered to be vastly underreported, and analyzing factors deterring reporting].) Child victims, in particular, commonly are reluctant to report such incidents and delay in doing so, or fail to provide a full report. Frequently, the child victim is unaware of the wrongful nature of the conduct or that what has occurred is not "normal." The victim also often experiences feelings of confusion and guilt, the desire to forget the incident, and the fear of not being believed, and in many instances may remain silent as a result of intimidation by the abuser. (See Note, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases* (1983) 83 Colum. L.Rev. 1745, 1756-1757; 2 Myers, Evidence in Child Abuse and Neglect Cases (2d ed. 1992) § 7.31, pp. 194-196.)

Several out-of-state courts forthrightly have acknowledged the erosion of the validity of the original premise and rationale underlying the fresh-complaint doctrine. These courts nevertheless have perceived a current valid purpose and need for the rule as a basis for admission of a victim's extrajudicial complaints, but have articulated a different rationale to support its continued application. In *Commonwealth* v. *Licata, supra,* 591 N.E.2d at page 674, for example, the Supreme Judicial Court of Massachusetts recognized the existence of a societal tendency to disbelieve sexual assault victims, the presumption that such a victim will make a prompt complaint, and the "unfortunate skepticism that exists as to the truth of allegations of [sexual assault] where the victim is perceived as having remained silent." The court held "that fresh complaint evidence should remain admissible 'on the ground that a victim's failure to make prompt complaint might be viewed

by the jury as inconsistent with the charge of sexual assault . . . and in the absence of evidence of complaint the jury might assume that none was made' . . . ." (*Ibid.*)

Similarly, the New Jersey Supreme Court, in *State* v. *Hill, supra,* 578 A.2d 370, reasoned: "It is true that the fresh-complaint rule does not necessarily contradict sexist notions of how a woman should act after she has been raped, but merely serves to establish that a woman acted in the 'correct' or 'natural' manner expected by society. Still, our judicial process cannot remove from every juror all subtle biases or illogical views of the world. The fresh-complaint rule responds to those jurors on their own terms. [¶] In cases in which a woman does, in fact, confide in someone that she has been raped, the fresh-complaint rule serves to neutralize the sexist expectations of some jurors that the woman should have complained after having been raped. . . . [¶] Society's perception and understanding of rape is changing. Yet, no one contends that subtle and overt bias against women victims of rape has been eradicated. Hence, we hesitate to discard the benefit of this rule to a woman who does complain without a clearer understanding of the burdens the rule may impose on the woman who does not complain." (*Id.,* at pp. 377-378.)

Reiterating these views, the Court of Appeals for the District of Columbia, in *Battle* v. *U.S., supra,* 630 A.2d 211, observed that, even in modern times, fresh-complaint evidence "negates prejudices held by some jurors by showing that the victim behaved as society traditionally has expected sexual assault victims to act, i.e., by promptly telling someone of the crime," and "rebuts an implied charge of recent fabrication, which springs from some jurors' assumptions that sexual offense victims are generally lying and that the victim's failure to report the crime promptly is inconsistent with the victim's current statement that the assault occurred." (*Id.,* at p. 217; accord, *People* v. *McDaniel, supra,* 611 N.E. 2d 265, 269.)

## IV

Although, as we have explained, one of the historic premises of the fresh-complaint doctrine—namely, that it is "natural" for the victim of a sexual offense to disclose promptly the commission of the offense in the event it did occur—largely has been discredited, recent out-of-state cases, noted above, demonstrate that it does not necessarily follow from this recognition that evidence of the circumstances surrounding a victim's reporting or disclosure of an alleged offense should be excluded from the jury's consideration. Rather, as we shall explain, we conclude that—setting aside the erroneous premise of the fresh-complaint doctrine—so long as the evidence in question is admitted for the *nonhearsay* purpose of establishing

the circumstances under which the victim reported the offense to others, such evidence ordinarily would be relevant *under generally applicable rules of evidence*, and therefore admissible, so long as its probative value outweighs its prejudicial effect. (Evid. Code, § 352.)

In explaining this conclusion, it may be helpful to begin by examining, in the context of *offenses other than sex offenses*, the admissibility of this type of evidence—i.e., evidence of the circumstances surrounding a crime victim's disclosure or report of an offense. In cases involving an alleged robbery or larceny, for example, it is common for evidence to be admitted describing how and when the crime was reported by the victim, on the ground that such evidence is relevant to the determination of whether the offense occurred. For example, in *People* v. *Blalock* (1965) 238 Cal.App.2d 209, 217 [47 Cal.Rptr. 604], the victim of an alleged robbery testified that, immediately following commission of the offense, he disclosed to others that he had been robbed, but reported to the police only that he had lost his wallet and money. He delayed reporting that he had been robbed until he saw a photograph in the newspaper identifying the defendant as a suspect in another robbery. (See also *People* v. *Washington* (1962) 203 Cal.App.2d 609, 610 [21 Cal.Rptr. 788] [victim of robbery testified to the circumstances of the offense, providing explanation for delay in reporting the crime]; see generally, 4 Wigmore, *op. cit. supra*, § 1142, pp. 317-319, and cases cited.) In such cases, evidence of a victim's conduct following the alleged commission of a crime, including the circumstances under which he or she did (or did not) promptly report the crime, frequently will help place the incident in context, and may assist the jury in arriving at a more reliable determination as to whether the offense occurred. When introduced for that purpose, evidence of the circumstances surrounding a victim's reporting or disclosure of an alleged crime clearly falls within the bounds of "relevant evidence," i.e., evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Of course, only the fact that a complaint was made, and the circumstances surrounding its making, ordinarily are admissible; admission of evidence concerning details of the statements themselves, to prove the truth of the matter asserted, would violate the hearsay rule. (4 Wigmore, *op. cit. supra*, § 1142, p. 318.) Thus, in *People* v. *Wooden* (1978) 66 A.D.2d 1004 [411 N.Y.S.2d 759], a case involving charges of theft of property by means of threats, the court held that evidence that the victim made immediate complaint to a friend of her property having been stolen, and that she was nervous and upset when making the complaint, was properly admissible, but that it was error to allow the friend to recite in detail a recounting of the theft

as told to him by the victim, in the absence of any claim by the defendant that the victim recently had fabricated her version of the incident. (*Id.*, at p. 761.)

In sexual as· well as nonsexual offense cases, evidence of the fact and circumstances of a victim's complaint may be relevant for a variety of nonhearsay purposes, regardless whether the complaint is prompt or delayed. To begin with, if such a victim did, in fact, make a complaint promptly after the alleged incident, the circumstances under which the complaint was made may aid the jury in determining whether the alleged offense occurred. Furthermore, admission of evidence that such a prompt complaint was made also will eliminate the risk that the jury, if not apprised of that fact, erroneously will infer that no such prompt complaint was made. Although, as we have seen, recent studies demonstrate that the absence of such a prompt complaint is not a reliable indicator that a sexual offense has not occurred, misconceptions relating to a victim's reactions to sexual assault still remain quite prevalent, as recognized by the recent out-of-state cases cited above, and thus it would be unreasonable to assume that all jurors are aware of, or fully accept, such findings. (See *Commonwealth* v. *Licata*, *supra*, 591 N.E.2d 672; 674; *State* v. *Hill*, *supra*, 578 A.2d at pp. 377-378; *Battle* v. *U.S.*, *supra*, 630 A.2d 211, 217.) Consequently, in the event the jury is permitted to infer erroneously that a prompt complaint was not made, when in fact one had been made, the jury might be inclined, in reliance upon that misconception, to draw the unwarranted conclusion that the alleged offense did not occur. Thus, if a complaint promptly was made, admission of evidence of the complaint is appropriate in order to avoid the risk that the jury will reach an improper conclusion on the basis of a *factually erroneous* inference to the contrary. As the Supreme Judicial Court of Massachusetts explained: "This rationale does not assume that only those rape victims who do make a fresh complaint are credible; it simply allows rape victims who do complain promptly to eliminate any unwarranted skepticism arising from lack of evidence of a prompt complaint." (*Commonwealth* v. *Licata*, *supra*, 591 N.E.2d at p. 674.)

On the other hand, when the victim of an alleged sexual offense did not make a prompt complaint but instead disclosed the alleged incident only some time later, evidence of the fact and circumstances surrounding the delayed complaint also may be relevant to the jury's evaluation of the likelihood that the offense did or did not occur. In the absence of evidence of the circumstances under which the victim ultimately reported the commission of an alleged offense, the jury in many instances may be left with an incomplete or inaccurate view of all the pertinent facts. Admission of evidence of the circumstances surrounding a delayed complaint, including those that might shed light upon the reason for the delay, will reduce the risk

that the jury, perhaps influenced by outmoded myths regarding the "usual" or "natural" response of victims of sexual offenses, will arrive at an erroneous conclusion with regard to whether the offense occurred. (Accord, *People v. Bledsoe* (1984) 36 Cal.3d 236, 247-248 [203 Cal.Rptr. 450, 681 P.2d 291] [expert testimony on rape-trauma syndrome may play a useful role in disabusing the jury of widely held misconceptions concerning rape and rape victims, enabling it to evaluate the evidence free of the constraints of popular misconceptions].) Particularly in a case such as the present one, in which the victim testifies to a series of alleged sexual offenses over a considerable period of time, during which the victim had the opportunity to disclose the alleged offenses to others but failed to do so, the exclusion of all evidence relating to the context in which the victim ultimately disclosed the alleged offenses to others is likely to leave the jury with an incomplete or erroneous understanding of the victim's behavior. So long as the evidence that is admitted is carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose, admission of such relevant evidence should assist in enlightening the jury without improperly prejudicing the defendant.

Of course, in many cases it will be the *defendant* who believes that the particular circumstances under which the victim reported the alleged offense—either promptly after the offense is alleged to have occurred or at some later date—cast doubt upon the veracity of the victim's charge, and the defendant will be entitled to introduce and rely upon such evidence in seeking to undermine the prosecution's case. (See, e.g., *People v. Harlan* (1990) 222 Cal.App.3d 439, 449 [271 Cal.Rptr. 653] [on cross-examination of minor victim, defense counsel attacked his credibility by attempting to demonstrate that he had made inconsistent statements and had delayed in reporting the alleged molestation].) Indeed, unlike the prosecution, which generally cannot introduce or rely upon the details or substantive content of the victim's complaint, a defendant who believes that the contents of the victim's extrajudicial complaint may be useful to impeach the victim's in-court testimony (or other aspects of the prosecution's case) generally is free to introduce and rely upon the details of such a complaint as a prior inconsistent statement. (Evid. Code, § 1235; see 3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, §§ 1966, 1973, 1978, pp. 1922, 1930, 1934.)

In sum, although one of the premises upon which the fresh-complaint doctrine historically has rested has been substantially eroded in recent times, our more recently acquired knowledge does not logically support a rule that would compel the exclusion of all evidence relating to the circumstances

under which an alleged sex-offense victim complained of, or disclosed, the alleged offense, but instead calls for revision of the contours of the doctrine to reflect more accurately the basis upon which the admissibility of such evidence should be evaluated. We conclude, for the reasons discussed above, that evidence of the fact of, and the circumstances surrounding, an alleged victim's disclosure of the offense may be admitted in a criminal trial for nonhearsay purposes under generally applicable evidentiary principles, provided the evidence meets the ordinary standard of relevance. (Evid. Code, § 210.)

Under this standard, the restrictions and limitations upon the application of the fresh-complaint doctrine articulated in *In re Cheryl H., supra* (153 Cal.App.3d at p. 1129), are not determinative of the admissibility of extrajudicial-complaint evidence. Thus, the admissibility of such evidence does not turn invariably upon whether the victim's complaint was made immediately following the alleged assault or was preceded by some delay, nor upon whether the complaint was volunteered spontaneously by the victim or instead was prompted by some inquiry or questioning from another person. Rather, these factors simply are to be considered among the circumstances of the victim's report or disclosure that are relevant in assisting the trier of fact in assessing the significance of the victim's statements in conjunction with all of the other evidence presented. The specific relevance of the extrajudicial-complaint evidence, however, must be shown in every case.

Of course, even if this evidence is relevant and therefore otherwise admissible under the foregoing standard, it is subject to exclusion under Evidence Code section 352 in the event the court determines that the probative value of the evidence is outweighed by the risk that the jury will consider it for impermissible hearsay purposes, or that the evidence will otherwise create a danger of undue prejudice or will mislead or confuse the jury. Indeed, in light of the narrow purpose of its admission, evidence of the victim's report or disclosure of the alleged offense should be limited to the fact of the making of the complaint and other circumstances material to this limited purpose. Caution in this regard is particularly important because, if the details of the victim's extrajudicial complaint are admitted into evidence, even with a proper limiting instruction, a jury may well find it difficult not to view these details as tending to prove the truth of the underlying charge of sexual assault (see 1 Jefferson, Cal. Evidence Benchbook, *op. cit. supra,* § 1.1, p. 12), thereby converting the victim's statement into a hearsay assertion (4 Wigmore, *op. cit. supra,* § 1136, p. 307).

V

In the present case, the evidence of Audrey's complaint to Diana Russell was relevant to the jury's determination whether the alleged molestation did or did not occur. Audrey testified to a series of sexual offenses

occurring over a period of several years during which she remained silent, failing to disclose the incidents to anyone. The circumstances under which the alleged molestation finally came to light was reasonably probative of the likelihood that the alleged molestation did or did not occur. The evidence of Audrey's complaint to Diana Russell—in response to prompting by a concerned adult who observed Audrey's distress, and with whom she felt safe and emotionally secure—tended to shed light upon the reasons she ultimately did come to disclose the molestation, as well as the reasons for her substantial delay in doing so, and tended to forestall any erroneous inferences that might have arisen in the absence of that evidence.

Additionally, the evidence of Audrey's complaint to Diana Russell clearly fell within the limits appropriately governing the admissibility of such statements.[6] Audrey testified that Russell was the first adult "whom she told about *this*" (italics added), and testified regarding the context and circumstances surrounding the disclosure—she was residing with the Russells, felt "scared," and was reluctant to tell her mother about the alleged molestation. During the direct examination of Diana Russell relating to Audrey's disclosures, the prosecutor did not refer directly to the incidents of molestation, but simply examined Russell as to her having engaged Audrey in a conversation, the length of that conversation, and Russell's perception of Audrey's emotional state during their conversation. Thus, the testimony was limited to the timing of Audrey's complaint and the circumstances under which it was made, omitting the content of the statements and specifically any description of the molestation itself.

For these reasons, we conclude the trial court did not err in admitting the evidence of Audrey's complaint to Diana Russell.

## VI

The judgment of the Court of Appeal upholding defendant's conviction is affirmed.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., Baxter, J., and Werdegar, J., concurred.

---

[6] Defendant does not challenge the admission of evidence of the complaints made by Audrey to *other* persons, independently of his challenge to the admission of the evidence of Audrey's complaint to Diana Russell. He simply argues that, if the admission of evidence relating to Audrey's complaint to Russell constituted error, the admission of evidence of additional complaints also constituted error.