Filed 7/30/25  P. v. Hann CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100076 |
| Plaintiff and Respondent, | (Super. Ct. No. 22FE018981) |
| v. | |
| EDWARD EVAN HANN, | |
| Defendant and Appellant. | |

A jury found defendant Edward Evan Hann guilty of three counts of sexually molesting victim.  Defendant contends the trial court prejudicially erred by admitting victim's reports of the abuse to a friend and to her brother.  Specifically, defendant contends those reports exceeded the scope of fresh complaint evidence, were unduly prejudicial, and denied defendant his constitutional right to a fair trial.  We disagree and affirm.  But we do order the trial court to correct a clerical error in the abstract of judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

In 2023, defendant was charged with three counts of lewd and lascivious acts upon a child by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. (Pen. Code, § 288, subd. (b)(1).) The prosecution's case consisted of victim's testimony, victim's Special Assault and Forensic Evaluation (SAFE) interview, the testimony of the lead detective involved in victim's case, and the testimonies of victim's brother and one of her friends.

## I

### *Victim's Testimony*

Defendant started living with victim's family in 2020 when victim was about eight years old. Victim's family consisted of victim's mom, sister, and brother. Defendant would take victim clothes shopping, out to eat, and to the park. One time, defendant bought victim a pair of red heels and a red dress even though victim wasn't really into dresses. She wore them on an outing with defendant but felt uncomfortable because the dress was a little short and the heels were tight.

One night, victim and defendant were watching a movie while victim's mom and sister were asleep and brother was in his room. Defendant told victim to bend over the couch. Victim thought he also told her "it wouldn't hurt" and he would hurt her family if she told anyone. Defendant then pulled down victim's shorts and underwear, got up to grab oil or Vaseline "or something," put it on his private part, and then put his private part in her bottom. Defendant breathed heavily. His body moved back and forth. Victim thought she was crying and thought she told defendant it hurt. Victim was not entirely sure, but she also thought she told him to stop. She didn't call out for help because she was scared defendant would do something to her family. Defendant told her to go to the bathroom where victim noticed "cleary white stuff" running down her legs. Either she or defendant wiped the stuff off, and defendant told her to throw away her shorts and underwear, which were now wet.

2

The same thing happened the next night. Victim went to the living room to play a video game with defendant. When asked why she would play a game with him after what he did the night before, victim responded that she "was young and [her] mindset wasn't really like – [she] wasn't really thinking around that age." After playing the game, defendant did the same thing to victim as the night before, except victim was lying flat on her stomach. Victim was confused and thinking a lot about why defendant was doing this to her. His private part was oily again and her bottom hurt with a sharp pain. Still scared defendant would do something to her mom or brother, victim didn't call out for help. She thought she told defendant it was hurting and thought she asked him to stop, but he didn't say anything or stop. Defendant told her to go to the bathroom, where victim wiped herself down because the "white gooey stuff" was on her legs again and then threw away her underwear and shorts.

The third night victim was watching a movie with defendant in the living room when defendant put the Vaseline or oil on his private part and put his private part in her bottom. Defendant did the back-and-forth motion, and victim felt a sharp pain. Victim thought she was crying, and she felt weird, confused, and "kind of sad and mad at the same time." When asked why she chose to watch a movie with defendant after the last two nights, victim responded, "[b]ecause I was a little girl and . . . my mind wasn't really . . . as it is now." When asked why she didn't call out for help this third night, victim responded that she was scared defendant would hurt her mom and brother. After the incident, victim went to the bathroom to clean up the same "white stuff" on her legs. She and defendant then threw away the now-wet clothes victim had been wearing.

Defendant continued to live with victim and her family. He continued to take victim out to eat and to the park and she liked spending time with him. He never did the same things to her, but he did slap her bottom or try to kiss her on the lips or the cheek when no one was around.

Victim's mom later kicked defendant out. Sometime after that, victim told three friends what happened and then told her brother.

## II

### *Friend's and Brother's Testimonies*

The prosecution moved to admit victim's disclosures to brother and one of her friends (friend) under the fresh complaint doctrine. At the motion hearing, the prosecution represented that victim (1) told friend and brother that defendant raped her and (2) went "a little further" with friend to say that defendant touched victim's butt. Defense counsel objected and asked that the disclosures not be admitted or at least be limited "only to what was told and not any detail." Defense counsel argued that the disclosures were more prejudicial than probative and were cumulative of each other. The court granted the prosecution's motion, concluding that multiple complaints were admissible and finding victim's reports, including their circumstances, highly probative and unlikely to necessitate undue consumption of time.

A.     Friend's Testimony

In 2020 or 2021, victim asked friend to come over, insisting it was an emergency. When friend arrived, victim "was crying a lot," "was really shaky" and "looked like she was really scared." Victim told friend that defendant "was like touching her and she felt really uncomfortable. She didn't know what to do to. She didn't know who to tell. She was really scared to tell anybody." Victim told friend that defendant touched her butt three times. Friend hugged victim and told her to tell her mom. Friend also cried because she didn't like seeking victim like that and because she "felt really bad for her and like she shouldn't have to go through that." Victim was scared and said she didn't think her mom would believe her because defendant told victim he would tell victim's mom that victim was lying.

4

Following friend's testimony, the court instructed the jury that victim's statements to friend were admitted "for the limited purpose of corroborating [victim's] testimony and not to prove the actual occurrence of the crime."

B.     Brother's Testimony

In May 2022, about four or five months after defendant left victim's home, victim called brother to their mom's closet.  Brother "knew something was up" by the face victim made, which was tearing up.  Victim "spit out three words . . . 'Evan raped me.' "  Brother didn't fully grasp what victim was telling him.  He called their mom immediately and told her to rush home.

The court then instructed the jury that victim's statement "He raped me" was "admitted for the limited purpose of corroborating [victim's] testimony and not to prove the actual occurrence of the crime."  The court also instructed that this statement was "not admitted to prove the truth of the matter asserted" but to show that victim reported the alleged crime and the circumstances of and context around the reporting.

Brother then continued his testimony.  He explained that right after victim said those words, "she just started crying, like bawling out crying."  And she "just kind of kneeled down on the floor and she was crying."  Brother was shocked, angry, frustrated, and devastated.  He "couldn't believe it.  Like how we – how we seen him and how we looked at him and like I couldn't really believe – couldn't put two and two together."  He was devasted because "we were all so comfortable around him" that it was "like a slap in the face."

When asked if he learned what part of victim's body defendant touched, brother responded that he overheard from mom and victim talking that defendant had touched "her butt area."  When asked if there was any specific part of victim's butt, brother responded, "[h]er anus.  [⁋] . . . [⁋]  That's the only place that I heard about."  The court interjected that its previous instruction regarding victim's statements applied to that statement as well, "that he overheard to the mom."

5

### III

*Victim's SAFE Interview*

Victim's SAFE interview took place in August 2022. In that interview, victim stated that defendant "put his private part . . . in [her] bottom." This happened "like three nights in a row," she thought. The first time, she thought defendant pulled down her pants. He then told her it wouldn't hurt. Defendant went to grab something like Vaseline, put it on his private part, and then put his private part in her bottom. It hurt, and she was "like kinda crying because [she] wanted him to stop, but he wouldn't listen." His body was moving back and forth and he breathed heavily. According to victim, defendant stopped after three to four minutes because he was scared brother might come out of his room. Victim went to the bathroom and felt a white, slimy substance dripping down her legs. Defendant went to get paper towels. Victim thought he said, "Don't tell your mom." He also told victim to clean up and that he'd throw away her shorts if there was something on them. Her body and bottom felt normal after.

The second and third times were basically the same. Defendant did the same thing that he did the other night, using Vaseline, putting his private part in her bottom, and throwing her clothes away after. "[L]ike, the second night or something," defendant told victim he would hurt her family if she told anyone.

After those three nights, defendant was nicer and tried to get closer to victim's friends. That's also when he started to kiss victim on the lips and cheeks and put her on his lap. Victim's mom kicked defendant out months later because they didn't get along very well.

### IV

*Defense Case*

Defense counsel cross-examined victim, friend, and brother. Victim could not answer many of defense counsel's questions because she couldn't remember. She explained that her brain was "a little foggy today" but it wasn't foggy when she testified

6

the day before.  Victim also admitted the following:  (1) her room and brother's room weren't that far from the couch where the incidents occurred; (2) victim could hear people in the living room from her room; (3) brother would often come out of his room at night for a snack or a drink; (4) on the first night, victim stood in the bent position without shorts or underwear while defendant left to grab something; (5) her body felt normal after the first night; and (6) she met with the prosecutor before coming to testify and watched the SAFE interview, which helped her remember all the details she gave in her testimony.

Brother agreed that memory fades over time and admitted he had reviewed his previous statement before testifying, which helped refresh his memory.  He confirmed that he liked to play video games in his room late into the night and would randomly come out for snacks and drinks.  He also testified that the red dress defendant bought for victim came down below the knees.

Friend admitted she had reviewed her previous statement before testifying, which refreshed her memory.

Defense counsel also cross-examined the lead detective.  The officer admitted the following:  (1) victim did not report the alleged abuse for almost a year; (2) the SAFE interview did not occur until almost three months after law enforcement became aware of the allegations; (3) not immediately presenting a child for a forensic interview might give time for others to make suggestions to the child; (4) nine-year-olds can falsely report sexual abuse or intentionally make up abuse for their own motives; (5) sexual abuse memories can be suggested or implanted in a child's memories; (6) during his investigation, the detective heard about different dates that the incidents may have happened; and (7) the detective never directly questioned victim, never tested how voices carry through victim's home, and never asked victim's mom about missing shorts and underwear.

V

*Closing Argument and Verdict*

In closing argument, defense counsel challenged victim's credibility, questioning whether her story made logical sense and pointing to inconsistencies between her testimony and her SAFE interview and how often victim said "I think" during those statements. Defense counsel argued the phrase "I think" meant victim was unsure, and that gave the jury reason to find doubt and reason to return a not guilty verdict. He also claimed the detective presented a "garbage" investigation.

In its instructions, the court repeated that victim's statement about the alleged offenses to friend and brother were admitted for the limited purpose of corroborating victim's testimony and not to prove the actual occurrences of the crimes.

The jury found defendant guilty of all three counts. The abstract of judgment indicates he was convicted by plea. Defendant timely appealed.

DISCUSSION

Defendant contends the trial court prejudicially erred by admitting friend's and brother's testimonies for three reasons: (1) the testimonies exceeded the permissible scope of fresh complaint evidence; (2) the testimonies were unduly prejudicial under Evidence Code section 352 (section 352); and (3) the testimonies were so prejudicial that they denied defendant his constitutional right to a fair trial. We disagree.

Under the fresh complaint doctrine, a sexual assault victim's out-of-court disclosure of an alleged offense is admissible for the limited, nonhearsay purpose of establishing "the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others" to help the jury decide whether the offense occurred. (*People v. Brown* (1994) 8 Cal.4th 746, 749-750 (*Brown*).) The jury may consider evidence admitted under this rule "for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime." (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522 (*Ramirez*).) The fresh complaint evidence that may be offered for this purpose is

limited in scope. In general, only the fact that a complaint was made and the circumstances surrounding its making are admissible. (*Brown, supra*, 8 Cal.4th at p. 760.) That said, the evidence is not limited "to the bare fact that the victim 'made a complaint' as to an unspecified subject matter," because such evidence "would be meaningless." (*People v. Burton* (1961) 55 Cal.2d 328, 351.) The nature of the offense and the identity of the offender is proper. (*Ibid*.)

Fresh complaint evidence is also subject to exclusion under section 352 if the court determines that its probative value is substantially outweighed by undue prejudice. (*Brown, supra*, 8 Cal.4th at p. 763; Evid. Code, § 352.) We review a trial court's evidentiary ruling under section 352 for abuse of discretion and reverse only if the ruling was arbitrary, whimsical, or capricious. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)

When a trial court erroneously admits evidence, we affirm the judgment unless it is reasonably probable a different result would have occurred had the evidence been excluded. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) But if the admission results in a due process violation by making the trial fundamentally unfair, we apply the more stringent prejudice standard in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.)

Here, defendant contends brother went beyond the scope of fresh complaint evidence when he testified that he heard defendant had touched victim's anus. He also contends friend went beyond the scope of fresh complaint evidence when she testified as to the following: (1) defendant was touching victim; (2) victim felt uncomfortable; (3) victim didn't know what to do or whom to tell; (4) victim was scared; (5) friend hugged victim and told her to tell her mom; (6) defendant touched victim's butt three times; and (7) victim was scared to tell her mom because she didn't think her mom would believe her because defendant threatened to tell her mom victim was lying.

9

With one exception discussed below, we disagree with defendant. The statements that defendant touched victim, specifically her butt or her anus, and that victim was uncomfortable described the nature of the offense with fewer details than other cases have allowed. (*People v. Burton, supra*, 55 Cal.2d at pp. 337, 351 [defendant " 'made me play with his peter' "]; *People v. Butler* (1967) 249 Cal.App.2d 799, 804-805 [" 'He said the man was sucking his thing' "]; *People v. Cordray* (1963) 221 Cal.App.2d 589, 594 [" 'She said he had pulled her pants down and he had kissed her between the legs' "].) The statements that victim was scared, didn't want to tell her mom, and didn't know what to do or whom to tell were admissible because they concerned the context and circumstances surrounding the disclosure and why victim delayed telling anyone. (*Brown, supra*, 8 Cal.4th at p. 764 [victim felt scared and was reluctant to tell her mother].) And the statement that friend hugged victim and told her to tell her mom was not an out-of-court statement by victim and helped explain why victim eventually brought the incidents to her family's attention who then went to law enforcement.

This leaves friend's disclosure of the *number* of times defendant touched victim's butt. Although the People concede, and we agree, that the number of times went beyond the scope of fresh complaint evidence, defendant did not object to that statement during the trial, and his earlier, more general objection did not cover this specific statement. (*People v. Mattson* (1990) 50 Cal.3d 826, 853-854 [a specific objection is required to enable the court to make an informed ruling and to enable the party proffering the evidence to cure the defect].)

Even if defendant did properly object, he fails to show a reasonable probability that a different result would have occurred had that statement been excluded. Victim offered her own testimony about the three incidents, giving the jury the opportunity to hear directly from her and judge her credibility. (*Ramirez, supra*, 143 Cal.App.4th at p. 1526.) The jury also heard victim's SAFE interview, which largely tracked her trial testimony. This means the jury "did not have to rely solely on secondhand statements

10

[victim] made to third parties" that were cumulative to her testimony and SAFE interview at trial. (*Ibid*.) Moreover, the jury was specifically instructed as to the purpose for which victim's statements to brother and friend could be used, and there is no indication that the jury was unable to follow those instructions. (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 390 [prejudice "refers to the possibility of misuse of the evidence"]; *People v. Homick* (2012) 55 Cal.4th 816, 867 [we presume jurors understand and follow instructions].) For these reasons, it is not reasonably probable that defendant would have fared better had the jury not heard friend state the number of times defendant touched victim's butt.

Although brother's and friend's statements were cumulative of victim's testimony and SAFE interview, we reject defendant's contention that the court should have excluded them as cumulative under section 352. The weighing of probative though possibly cumulative evidence against its prejudicial nature is a matter entrusted to the sound discretion of the trial court. (*People v. Medina* (1995) 11 Cal.4th 694, 749.) When evidence arguably lacks credibility, other evidence that will bolster its credibility is corroborating, not merely cumulative. (See *People v. Bolin* (1998) 18 Cal.4th 297, 319.) Here, victim's credibility was central to defendant's case. As a result, the extrajudicial statements provided through brother and friend were not merely cumulative of victim's testimony; rather, they served to corroborate her testimony and satisfied the purpose of the fresh-complaint doctrine. (*Brown, supra*, 8 Cal.4th at p. 761 ["[w]hen the victim of an alleged sexual offense did not make a prompt complaint but instead disclosed the alleged incident only some time later, evidence of the fact and circumstances surrounding the delayed complaint . . . may be relevant to the jury's evaluation of the likelihood that the offense did or did not occur"].)

Defendant's three remaining prejudice contentions fare no better. First, he contends that the improper fresh complaint statements tipped the section 352 balance toward undue prejudice. We disagree. As we explained, a single statement – the number

11

of times defendant touched defendant's butt – went beyond fresh complaint evidence. We disagree that this single statement was more prejudicial than probative. It was no more damaging than victim's detailed testimony regarding the three incidents, and it was accompanied by an instruction that it could be used only for the purpose of corroboration. Moreover, defendant's theory was that *no* lewd or lascivious acts occurred, not that the number of acts was inaccurate.

Second, defendant contends that victim's extrajudicial statement to brother that defendant "raped" her was "emotionally charged" and likely to evoke a strong emotional bias against defendant particularly because defendant was charged with committing a lewd or lascivious act, not rape. But defendant failed to assert this contention during the hearing on the prosecutor's motion to admit this specific statement. (*People v. Mattson*, 50 Cal.3d at pp. 853-854.) And while this statement was certainly *damaging* to defendant, "damaging" is not synonymous with "prejudice." (*People v. Jimenez, supra*, 35 Cal.App.5th at p. 390.) We cannot conclude that victim's extrajudicial statement to brother that defendant raped her is more inflammatory than the direct trial testimony she offered regarding defendant's acts. (See *ibid*. [offense was described in detail through the victim's direct testimony].)

And third, defendant takes similar issue with friend's and brother's descriptions of victim's demeanor during the disclosures – i.e., victim was "bawling out crying" and victim was "really shaky" – and of their reactions to those disclosures – i.e., brother was angry, frustrated, and devastated and friend felt really bad for victim because she shouldn't have to go through that. Defendant contends these descriptions were manifestly prejudicial, "emotionally charged," and denied defendant his constitutional right to a fundamentally fair trial. In his view, the prejudice was compounded by the length of victim's and friend's testimonies that he claims spans 40 pages of the reporter's transcript and by the prosecutor's repeated emphasis of victim's extrajudicial statements in closing argument.

12

Defendant's account of the record is inaccurate. Victim's direct testimony spans around 70 pages while brother's and friend's direct testimony on victim's disclosure span around seven and 10 pages, respectively. In the prosecutor's closing argument, which spans around 22 pages, the prosecutor briefly mentioned victim's disclosures to friend or brother five times and spent just over two pages describing the disclosures and why they corroborated victim's testimony. We disagree with defendant's characterization of the prosecutor's closing argument as "repeatedly referenc[ing] and emphasiz[ing]" the extrajudicial statements.

Also, defendant did not object to the purportedly "emotionally charged" statements during the trial, and his general objection to the admission of the disclosures did not cover these specific statements. (See *People v. Partida, supra*, 37 Cal.4th at pp. 433-434.) Even assuming defendant did properly object, friend's and brother's descriptions provided the circumstances surrounding victim's disclosures and were highly probative of victim's credibility. (*Brown, supra*, 8 Cal.4th at p. 762 [fresh complaint evidence properly includes "the circumstances surrounding the making of the complaint"].) The fact that friend's and brother's testimonies could have had a powerful impact on the jury in assessing credibility does not mean they were overly prejudicial under section 352 or created a fundamentally unfair trial. (See *People v. Jimenez, supra*, 35 Cal.App.5th at pp. 390-391.)

One final point: the abstract of judgment must be corrected to show conviction was by jury rather than plea. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

DISPOSITION

The judgment is affirmed.  The trial court is directed to (1) prepare a corrected abstract of judgment reflecting defendant's conviction by jury, rather than by plea, and (2) forward the corrected abstract to the Department of Corrections and Rehabilitation.


         /s/
         MESIWALA, J.


We concur:


  /s/
ROBIE, Acting P. J.


  /s/
FEINBERG, J.