Filed 5/14/13  In re P.B. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re P.B., a Person Coming Under the Juvenile Court Law. | B243581 (Los Angeles County Super. Ct. No. CK91154) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.B., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Elizabeth Kim, Referee.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Kim Nemoy, Principal Deputy County Counsel for Respondent.

## INTRODUCTION

J.B. (mother), mother of now six-year-old P.B. and nearly one-year old R.B. appeals from the juvenile court's orders finding continued jurisdiction over P.B., assuming jurisdiction over R.B., and removing R.B. from father's custody. We affirm.

## BACKGROUND

On December 19, 2011, the Los Angeles County Department of Children and Family Services (Department) filed a petition pursuant to section 300 of the Welfare and Institutions Code[1] on behalf of five-year-old P.B. The petition as amended and sustained alleged that P.B.'s father, Jason B. (father), had a history of substance abuse, currently was abusing prescription medication, had been under the influence of prescription medication while caring for and supervising P.B., and had a criminal conviction. The petition further alleged that father had mental and emotional problems including suicidal ideation and had failed to take his psychotropic medication. In addition, father was alleged to have possessed a handgun, a rifle, and ammunition in P.B.'s home while P.B. was present in the home.

The Department's December 2011 Detention Report stated that father was reported to have had a gun and to have threatened to commit suicide. According to the report, father's 18-year-old son Jason, Jr., wrestled the gun from father and threw it out of a window. Mother went outside and retrieved the gun. Father's 15-year-old son Robert called the police. When the police arrived, mother would not allow them access to the home, to father, or to P.B., who allegedly witnessed the incident. Jason, Jr. told the police that father had mental health issues and a history of suicidal ideation and attempts. A court order prohibited father from having weapons or firearms in the home. Jason, Jr. stated that mother also had mental health problems. When Robert stepped outside to speak with the police, mother immediately ordered him back inside.

---

[1] All statutory citations are to the Welfare and Institutions Code unless otherwise noted.

The following day, a social worker interviewed P.B. P.B. appeared healthy and well cared for and denied abuse of any kind. She told the social worker that mother and father had gotten into a "big fight." P.B. did not witness the fight because she was watching T.V. P.B. said that her parents did not fight often and did not hit one another when they fought. She had seen a gun under father's bed that father kept for protection from "bad guys." P.B. could not remember the last time she saw the gun and denied that she saw it the previous night.

The social worker asked mother about a May 2010 child abuse investigation. The report stated that mother and father separated and mother and P.B. did not live with father. Mother said that she left father at that time because he was addicted to prescription medication. Mother returned because father attended a rehabilitation program. Father had changed and was doing much better. Father had completed an anger management program and he and mother attended therapy together.

Mother told the social worker that father and Jason, Jr., had gotten into an argument the previous night. Jason, Jr. upset father and told him that "he should just kill himself." Father responded, "Well maybe I should just do it then." Mother denied that father had a gun in the home. The social worker confronted mother about conflicts between her and P.B.'s versions of the incident. She asked mother why P.B. would say mother was fighting with father when it was Jason, Jr. who was fighting with father and why P.B. would say she saw a gun under father's bed. Mother said she did not know. She stated that she did not allow the police into her home because she did not want father to go to jail. If father went to jail, he would not get the help he needed. Mother denied that she or father had been diagnosed with a mental illness. Mother stated that she had no concerns about father other than his need to attend therapy to address issues he had with his son. Father had never previously stated that he wanted to kill himself.

Mother told the social worker that P.B. had significant medical issues including cerebral palsy and kidney and urinary tract infections. Mother permitted the social worker to assess the condition of the home. The home appeared to be clean. The social

worker did not see any firearms or other safety hazards. Mother agreed to protect P.B. from father until the social worker obtained further information and spoke with father.

About a week later, mother called the social worker and told her she had not been "completely honest" when they first spoke. She admitted that father had a gun, but said that she did not know he had it in the house. Father had been arguing with Jason, Jr. Father was trying to leave the house with the gun. Mother told Jason, Jr. to stop father and call the police. She said that Jason, Jr. threw the gun out of a window. Mother told the social worker that she learned "after the fact" that father had started abusing prescription drugs again and was trying to detoxify on his own. Mother gave father an ultimatum, telling him that he needed to get help or she and P.B. would move out. According to mother, father went to his union and they found him an in-patient program. Father had voluntarily enrolled in a 90-day substance abuse treatment program at the Pat Moore Foundation in Costa Mesa.

The social worker went to mother's home to interview her again. Mother said that when she left father in 2010, one of her conditions for returning was that he was to dispose of his guns. When the police obtained a warrant to search mother's home, there were no guns in the house. Paternal grandfather had picked up the handgun, and father's rifles already were at paternal grandfather's house. Mother said father gave the police paternal grandfather's address and they picked up the firearms.

When the police conducted a search of the home, they recovered a rifle and 1,000 rounds of ammunition in the garage. According to the police, father provided paternal grandfather's address where the police confiscated 18 rifles, including two assault rifles. Father was not supposed to have the firearms or ammunition due to a firearms restriction. A police detective told the social worker that he believed that father had all his guns at his home at the time of the incident. Father was arrested and charged with felony possession of an assault rifle.[2] The detective believed that father was very unstable. The detective had been informed that father's grandmother died in 2006 and father had anger

_____

[2] In June 2012, father apparently was convicted of misdemeanor illegal firearm activity.

4

issues since then. According to the detective, father's children did not respect him, which may have contributed to father's desire to kill himself.

The social worker interviewed father at the Pat Moore Foundation. Father said he had previously participated in a seven-day detoxification for prescription pills. Father planned to stay in the program at the Pat Moore Foundation for 90 days, and then receive an evaluation to determine if he needed to stay longer.

About the incident at issue, father said that he and mother were having an argument. Father had knee surgery in June and was prescribed an opiate-based pain medication. Initially, he took the medication as prescribed. Later, however, he took 15 or more pills a day. At the time of the incident, father had not taken the pain medication for two or three days and was going through withdrawal symptoms. He was not in his right mind and had an isolated moment of weakness. Father stated that he was not planning to kill himself; he just wanted to leave the house to clear his head. He said that the gun was not loaded, but the fact that he had it was stupid. Father said that he had an addiction that he needed to fix. He denied abusing illicit drugs.

Father stated that he had never been diagnosed with a mental illness, but that he saw a therapist years before when he was having family problems. Although he took Prozac for a while and still had a prescription, he was no longer taking the drug.

Father told the social worker that he had only one firearm in his home. He explained that he had the firearms that were confiscated from paternal grandfather's house because he hunted doves. Father believed that he could possess firearms under the firearms restriction once he completed probation. He believed that he just could not purchase new firearms. Father said all of his guns had trigger locks and he stored them in a safe without ammunition.

The social worker explained to father that P.B. was at risk due to father's abuse of opiate-based prescription drugs and his threat to kill himself. Accordingly, the social worker would take the matter to dependency court. The social worker told father that because he was in a rehabilitation facility and P.B. thus was not in immediate danger, he would have to consent to P.B.'s detention. Father responded that he knew he was wrong

and would not contest the matter in any way. He told the social worker that she had his permission to do whatever she needed to do.

At the detention hearing, the juvenile court found a prima facie case for detaining P.B. It released P.B. to mother on the condition that father not be in the home. The juvenile court ordered family reunification services for father. Father was permitted monitored visits with P.B.; mother was not permitted to be the monitor.

The Department's January 2012, Jurisdiction/Disposition Report stated that there had been prior referrals concerning father. Allegations that father emotionally abused Jason, Jr. had been substantiated. Father also had juvenile and adult criminal records. The report stated that during a January interview P.B. said she had been in her parents' bedroom when they began to fight. Father and mother moved to the living room, and P.B. remained in the bedroom. Father retrieved a gun from a safe under the bed. P.B. asked the social worker not to tell mother what she reported because mother would be angry. Mother told P.B. that father said he wanted to kill himself and Jason, Jr. took the gun from him. P.B. denied that she ever heard father making suicidal statements. According to the report, P.B. said, "My dad took pain pills. He takes it even when he doesn't have pain." She said that father "acted" "[t]he same" when he took the medication. Mother and father stated that they had been arguing when father took the gun from under the bed.

Mother reported that she was attending family therapy and Alanon meetings. Father admitted that but for a four-month period of sobriety in 2010, he had been addicted to and abused Vicodin and Norco pain medication since 2008 when he had knee surgery. At the time of the incident in December 2011, father was taking Norco pills and drinking vodka heavily.

According to the Department, following P.B.'s detention, father demonstrated his desire to address child safety issues and reunify with his family by fully acknowledging his addiction to pain medication and enrolling in an inpatient substance abuse program to address his addiction. Father was participating in therapy. Father also had been fully cooperative with the Department in its investigation and visited P.B. regularly.

6

Mother and father waived their right to a trial. Father pleaded no contest. The juvenile court found mother to be non-offending. The juvenile court declared P.B. to be a dependent under section 300, subdivision (b), removed her from father's custody, and placed her in mother's home. It ordered mother to participate in individual counseling to address all case issues, couples counseling with father, and Alanon meetings. Father was ordered to participate in individual and couples counseling, parent education, drug rehabilitation with random testing, and AA/NA with a sponsor, and to have a psychiatric evaluation.

According to the Department's April 2012, Interim Review Report, P.B. and mother wanted father to return home. Father's case manager at the Pat Moore Foundation reported that in February 2012, the clinical team determined that father had made "excellent progress." Father completed his three-month drug program. All of father's twice-weekly drug tests had been negative. Regular breathalyzer tests for alcohol also had been negative. Father's psychiatrist reported that father was responding well to drug therapy. His individual therapist stated that she did not see in father a history of suicidal ideation or a current desire to hurt himself or others.

On June 26, 2012, the Department filed a section 300 petition on behalf of newborn R.B. Under subdivisions (b) and (j) of section 300, the petition alleged that father had a history of substance abuse and currently abused prescription medication and alcohol. In 2011, father was under the influence of prescription medication and alcohol when he cared for R.B.'s sibling, P.B. Father had a criminal history of driving while under the influence of alcohol. The petition further alleged that father had mental and emotional problems including a diagnosis of bipolar disorder and suicidal ideation; father failed to take his psychotropic medication as prescribed; mother and father created a detrimental and endangering home environment for R.B.'s sibling, P.B., because father possessed a handgun, a rifle, and ammunition in P.B.'s home when P.B. was present; and P.B. was a current dependent of the juvenile court due to father's substance abuse, mental and emotional problems, and possession of firearms and ammunition to which P.B. had access.

7

The Department's June 2012 Detention Report stated that father had completed his three-month drug program in April 2012 and had been referred to Dr. Hutain. According to Dr. Hutain, father was diagnosed with bipolar disorder, attention deficit disorder, and hypertension. Pamela Johnson, father's individual therapist, stated that she regularly asked father if he were experiencing any suicidal ideation. Father never reported any suicidal ideation. In Johnson's opinion, the incident in December 2011 was caused by a drug-induced psychosis. Based on father's work in therapy and his dedication to his recovery program, Johnson believed that father did not pose a threat to himself or others. Father and mother's conjoint family therapist reported that father was making progress. Father's drug testing since April 2012 had been negative.

A social worker spoke with mother soon after R.B.'s birth. Mother stated that she and father planned to have father care for R.B. when mother took P.B. to the doctor the following week. The social worker suggested that the paternal or maternal grandmother care for the baby. Mother objected, stating that the events leading to jurisdiction over P.B. occurred prior to R.B.'s birth and R.B. was not part of the dependency proceeding. The social worker spoke with father and requested that R.B. be detained in mother's care. Father stated that he did not want R.B. "in the system" and wanted the court informed that he did not agree to jurisdiction over R.B.

The Department acknowledged that mother and father were in compliance with the case plan, but still concluded that R.B. would be at risk in father's care due to his history of mental illness and the short length of time he had been in treatment. Father recently disclosed to his psychiatrist that he had symptoms of irritability causing the doctor to change father's medication. The social worker felt that father had not been on his new prescription long enough to determine its effectiveness in treating father's symptoms. Mother exercised poor judgment, the social worker stated, by arranging to have father care for R.B. when the juvenile court had not allowed father to have unmonitored visits with P.B. or mother to monitor father's visits. The updated report from father's therapist did not "fully address the assessment of father's mental status" or fully address the issue of suicidal ideation.

8

At the detention hearing, the juvenile court found a prima facie case for detaining R.B. The juvenile court released R.B. to mother, ordered family reunification services for father, and granted father monitored visits with R.B.

The Department's July 2012 Jurisdiction/Disposition Report stated, among other things, that father had been diagnosed with dysthymia and ADHD. He saw Dr. Hutain once a month. Neither mother nor father agreed with R.B.'s removal from father. Mother wanted father to return to the home. The Department remained concerned about father despite his continued participation in the court-ordered case plan because his sobriety was "only recent given his history of usage." The Department also was concerned about the stabilization of father's mental health given that his doctor only recently changed his medication. Father's counselor and case manager at the Pat Moore Foundation was concerned about father's prescription for Adderal, a speed based medication, because it was a medication to which father might become addicted.

A July 23, 2012, Last Minute Information for the Court attached a letter from Dr. Hutain. Dr. Hutain stated that he saw father the prior week. Father was not severely depressed and was able to function well. Father's underlying diagnosis appeared to be dysthymia. Father was sleeping well and had not had any fits of anger. He was clear from all drugs, his mind was clear, and he was able to concentrate. Father was compliant with his medications and had good results. Dr. Hutain was to see father in two months for a follow-up. With respect to "safeguards" at father's house, the doctor recommended continued therapy and a call from mother once a week.

On August 6 and 20, 2012, the juvenile court held a combined review hearing for P.B. and jurisdiction/disposition hearing for R.B. The juvenile court found that continued jurisdiction over P.B. was necessary. The Department argued that it had not received a full psychiatric evaluation of father. The juvenile court found that the conditions that justified jurisdiction continued to exist and would exist if supervision was withdrawn. The juvenile court also stated that it was not satisfied with the psychiatric services father had received and appointed an expert pursuant to Evidence Code section 730 to perform a full psychiatric evaluation of father.

9

Mother moved, pursuant to section 350, subdivision (c), to dismiss the section 300 petition as to R.B. The Department "submitted" on the dismissal of the allegations under subdivision (b), but argued that the juvenile court should amend the petition to remove mother from the subdivision (j) allegations and find jurisdiction under the subdivision (j) allegations as amended. After further argument, the juvenile court granted mother's motion as to the subdivision (b) allegations, ordered the subdivision (j) allegations amended to remove the allegations against mother and the allegation that father had been diagnosed with bipolar disorder, and found true the subdivision (j) allegations as amended. The juvenile court stated that the petition raised the same concerns that were litigated with respect to P.B. Although father had engaged in court-ordered treatment, a full psychiatric evaluation of father had not been completed and submitted to the court. Absent such an evaluation, the juvenile court remained concerned about father's "mental condition and history." The juvenile court ordered that R.B. be placed with mother on the condition that father not reside in the home. Father was to receive monitored visits with R.B.; mother was not to be the monitor.

## DISCUSSION

### I. Sufficient Evidence Supports the Juvenile Court's Order Continuing Jurisdiction Over P.B.

Mother contends that there is insufficient evidence to support the juvenile court's order continuing jurisdiction over P.B. because father was sober and had complied with his mandated services and mother had participated in individual counseling, couples counseling, and Alanon. Although father's commendable sobriety and participation in his mandated services suggest that father will successfully address the issues that led to jurisdiction over P.B., sufficient evidence was before the court at the time of the six-month review hearing to support continued jurisdiction over P.B.

At the six-month review hearing for a child who has remained in parental custody, the juvenile court determines whether continued supervision is necessary. (§ 364, subd. (c); *In re Gabriel L.* (2009) 172 Cal.App.4th 644, 650.) The juvenile court must

10

terminate its jurisdiction unless the social worker or the Department demonstrates by a preponderance of evidence that the conditions still exist that justified the initial assumption of jurisdiction, or that those conditions are likely to exist if supervision is withdrawn. (§ 364, subd. (c); *In re Gabriel L., supra,* 172 Cal.App.4th at pp. 650-651.)

We review a juvenile court's finding of jurisdiction for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; *In re N.S.* (2002) 97 Cal.App.4th 167, 172.) "The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]" (*In re J.K., supra,* 174 Cal.App.4th at p. 1433.) "The issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to other appeals." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) An appellate court does not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. (*Ibid.; In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564 [issues of fact and credibility are questions for the trier of fact].) Instead, the reviewing court draws all reasonable inferences in support of the juvenile court's findings, considers the record most favorably to the juvenile court's order, and affirms the order if it is supported by substantial evidence even if other evidence supports a contrary conclusion. (*In re L.Y.L., supra,* 101 Cal.App.4th at p. 947.)

Mother contends that there is insufficient evidence to support the juvenile court's order for continued jurisdiction over P.B. because the evidence showed that P.B. was well cared for; mother was attending family therapy and Alanon meetings; mother, P.B., and father wanted father to return home; father's psychiatrist diagnosed father with dysthymic disorder (a mild mood disorder) and father had made excellent progress; father had worked on many issues with mother in couples therapy; father's medication had been adjusted after a diagnosis of ADHD; father's drug tests were all negative; and father and mother were in compliance with ordered services. Mother states that the sustained petition stated that father had a history of substance abuse, he had mental and emotional problems that included suicidal ideation, he kept firearms and ammunition in the family's home, and he had a conviction for driving under the influence. Mother argues that there

11

is no "current and direct nexus" between father's "history of substance abuse and mental emotional problems and any risk" to P.B.

Continued jurisdiction was proper at the six-month review hearing. Prior to father's apparently successful drug rehabilitation at the Pat Moore Foundation following the December 2011 incident, father had been addicted to and had abused pain medication since 2008. During that addiction, father entered a drug detoxification program. Father remained free of pain medication for four months in 2010 before relapsing and resuming his drug abuse. By the time of the six-month review hearing, only four months had passed since father completed his 90-day substance abuse treatment program at the Pat Moore Foundation. Given father's prior unsuccessful effort at drug rehabilitation and the seriousness of father's conduct while under the influence of drugs and alcohol in this matter—threats to kill himself while holding a handgun—there is sufficient evidence to support the juvenile court in continuing jurisdiction over P.B.

Mother contends that the facts in this case are like those in *In re N.S., supra,* 97 Cal.App.4th 167 in which the Court of Appeal reversed an order of continuing jurisdiction. There, the juvenile court assumed jurisdiction over N.S. when her cousin was hurt nonaccidentally while in the father's care. (*Id.* at p. 172.) N.S. was removed from her father's custody and remained at home with her mother. (*Id.* at p. 171.) The father was ordered not to reside in the home. (*Id.* p. 170.)

At the six-month review hearing the juvenile court issued an order continuing jurisdiction over N.S. and the father appealed. (*In re N.S., supra,* 97 Cal.App.4th at p. 169.) The issue at the jurisdiction hearing had been the father's ability to manage his stress and/or anger. (*Id.* at pp. 172-173.) A psychological evaluation stated that the father "'may be impulsive and prone towards occasional temper outbursts.'" (*Id.* at p. 173.) The juvenile court noted, however, that there was no evidence that the father had acted impulsively or had a temper outburst in the six months since the juvenile court took jurisdiction over N.S. (*Id.* at p. 173.) Moreover, the father was in "total compliance with his case plan." (*Ibid.*) The Court of Appeal reversed the juvenile court's order, holding

12

that there was no evidence that the conditions that caused the juvenile court to take jurisdiction over N.S. still existed or would exist if jurisdiction were terminated. (*Ibid.*)

Although there are similarities between the facts in this case and those in *In re N.S., supra,* 97 Cal.App.4th 167, such as father's commendable case compliance, the distinguishing factor is evidence of father's drug addiction and prior unsuccessful effort at drug rehabilitation. As discussed, evidence of father's short-lived sobriety and prior unsuccessful efforts at drug rehabilitation constituted sufficient evidence supporting the order continuing jurisdiction notwithstanding his case plan performance. Accordingly, the juvenile court did not err in continuing jurisdiction over P.B.

## II. Sufficient Evidence Supports Jurisdiction Over R.B.

The section 300 petition with respect to R.B. asserted identical allegations under subdivisions (b) and (j). Mother moved to dismiss the entire petition under section 350, subdivision (c), arguing that the Department had not met its burden of proof. The juvenile court granted mother's motion as to the subdivision (b) allegations, but sustained the petition as to the subdivision (j) allegations (with some amendments that are not relevant here). Mother contends that if the Department failed to meet its burden of proof with respect to the subdivision (b) allegations, then it necessarily failed to meet its burden with respect to the identical allegations under subdivision (j). Sufficient evidence supports the juvenile court's finding of jurisdiction.

Section 300, subdivision (j) provides, "The child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and sex of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." At P.B.'s six-month review hearing, the juvenile court found that the conditions that justified jurisdiction over P.B. continued to exist and would exist if supervision were withdrawn. (§ 364, subd. (c); *In re*

*Gabriel L., supra,* 172 Cal.App.4th at pp. 650-651.) Over mother's challenge, we are affirming that finding. Because there was substantial evidence supporting the juvenile court's finding that there was a need for continuing jurisdiction over P.B., R.B.'s sibling, there was substantial evidence supporting the juvenile court's finding that R.B. also faced a substantial risk of abuse or neglect within the meaning of section 300, subdivision (j). Whether the juvenile court erred in finding that the Department had not met its burden of proof on the section 300, subdivision (b) allegations as to R.B. is not before us.

## III. Sufficient Evidence Supports the Juvenile Court's Order Removing R.B. from Father's Care

Mother makes the alternative argument that if we hold that there is sufficient evidence to support jurisdiction over R.B. then there is insufficient evidence to support the juvenile court's disposition order removing R.B. from father's physical custody. Sufficient evidence supports the order.

Consistent with the juvenile court's finding, the parties assert that the Department's burden of proof to remove R.B. from father's physical custody was clear and convincing evidence that there were no reasonable means by which R.B. could have been protected without removing R.B. from father's physical custody. (§ 361, subd. (c)(1); *In re Henry V.* (2004) 119 Cal.App.4th 522, 528-529.)[3] On appeal, we review the juvenile court's finding of clear and convincing evidence for substantial evidence. (*In re Henry V., supra,* 119 Cal.App.4th. at p. 529.)

Substantial evidence supported the juvenile court's order removing R.B. from father's physical custody. At the time of the disposition hearing, there was evidence that father had only recently completed his 90-day substance abuse treatment program at the Pat Moore Foundation; father previously had participated in a drug detoxification

---

[3] Because father was living outside the home when R.B. was born and R.B. remained in the custody of one of her parents, the proper burden of proof may have been preponderance of the evidence. (See *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1112-1114, abrogated on other grounds in *People v. Brown* (1994) 8 Cal.4th 746, 763.) Under either burden of proof, our holding would be the same.

program only to relapse into prescription drug abuse; and father's underlying conduct in this matter—while under the influence of drugs and alcohol, he held a handgun and threatening to kill himself—was serious. Accordingly, even though father's performance in his case plan has been encouraging, substantial evidence supports the juvenile court's finding that there were no reasonable means of protecting R.B. short of removing him from father's physical custody.

### DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MOSK, J.

We concur:

TURNER, P. J.

ARMSTRONG, J.