Filed 5/25/22  P. v. Hill CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075324 |
| v. | (Super.Ct.No. RIF1702026) |
| MARTIN GRANT HILL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Steven G. Counelis, Judge.  Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Kathryn A. Kirschbaum and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Martin Grant Hill guilty of 14 counts of committing a lewd or lascivious act upon a child under the age of 14 years old. (Pen. Code, § 288, subd. (a).)[1] The jury found true the allegations that, for 10 of the counts, defendant engaged in substantial sexual conduct with the victim. (§ 1203.066, subd. (a)(8).) The trial court sentenced defendant to prison for a term of 24 years.

Defendant raises five issues on appeal. First, defendant contends the trial court erred by excluding expert testimony pertaining to false confessions. Second, defendant asserts the trial court erred by admitting the victim's out of court statements under the fresh complaint doctrine. Third, defendant contends the trial court erred by admitting evidence of child sexual abuse accommodation syndrome (CSAAS). Fourth, defendant asserts the trial court violated his constitutional rights of due process and confrontation by limiting his examination of the victim. Fifth, defendant contends that, cumulatively, the foregoing alleged errors require the judgment be reversed. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A.    DEFENDANT'S CRIMES

Defendant is the victim's stepfather. Defendant molested the victim over a three-year period when the victim was between the ages of nine and 12 years old, which would have been approximately 2013 to 2016. When the victim initially reported the molestations, she said she had been molested approximately 14 times. At trial, the

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

victim estimated that she had been molested approximately 10 times but agreed that her memory was better when she initially reported the molestations.

The victim had a bedroom to herself. Defendant entered the victim's bedroom at night, when she was sleeping. Sometimes defendant crawled into the room. While defendant was on the floor, he rubbed the lips of the victim's vagina with his fingers and sometimes inserted his fingers into her vagina, over the victim's panties. Defendant also touched the victim's breasts over her clothes.

During an interview with law enforcement, defendant admitted that he consciously went into the victim's bedroom and molested her approximately 16 times, and on approximately 10 of those occasions he rubbed her vagina. Defendant sometimes masturbated while molesting the victim. Defendant further admitted that his pornography preference was images of 15- or 16-year-old girls.

B.     REPORTING THE CRIMES

In March 2017, when the victim was 13 years old, the victim told her mother (Mother) about defendant molesting her. Mother was upset and defendant moved out of the home. However, the victim felt bad about the situation, in part because defendant provided the majority of the family's income. The victim told Mother that the molestation was not as bad as it actually was and that Mother should let defendant return to the home. Mother permitted defendant to return, and the victim had a lock put on her bedroom door in order to prevent defendant from molesting her.

In April 2017, the victim and defendant argued over a seat on the sofa. The argument was "the last straw" and "a breaking point" for the victim. That night, the

3

victim texted a suicide hotline and, during a conversation with the hotline, disclosed that defendant molested her for three years.

The following day, a county social worker along with a sheriff's deputy contacted the victim about the molestation allegations she made during her communication with the hotline. The victim told the social worker and the deputy about the molestation. The victim told the social worker she did not want to involve the courts or Mother. As a result of the victim's disclosure, she moved to her father's home. The victim found the transition to her father's home to be difficult because she missed Mother, her sister, and her friends, and because her father has "a lot of very different rules that [the victim] wasn't used to."

After the victim moved to her father's house, the victim visited Mother. During the first visit, Mother told the victim "to say that [defendant] didn't do it so [the victim] can go back home." Mother told the victim to lie in court, and she blamed the victim "for breaking up the family." There were two other visits in which Mother told the victim to lie about the molestations. At one supervised visit, Mother gave the victim a note, inside a tin of cookies, that claimed the victim was "destroying [Mother's] life" and that the victim should "tell everybody that this didn't happen." At another supervised visit, Mother made it appear that she was showing the victim photographs on her phone, but Mother actually showed the victim a note written in the notes app "about [Mother's] financial problems and how, like, [the victim was] screwing everything up."

During one of the victim's visits with Mother, Mother told the victim to call Mother's mother (Grandmother) and say that the molestations did not occur. The victim

4

complied and told Grandmother that she had been "lying and that [she] was going to fix all of this." The victim made the foregoing statement to Grandmother because the victim felt her family no longer liked the victim and the only way she could live with Mother and her sister again was to say that the molestations had never occurred. The victim told Mother that the touching was not sexual, that it was akin to poking and tickling, and that the social worker had misconstrued the victim's statement. If the victim had the situation to do over again, she would not have reported the molestations because she felt as though she had been punished for the disclosure, in that she no longer lived with Mother and her sister.

C.    DEFENSE

During an interview with law enforcement, defendant said that he has insulin dependent diabetes. Defendant continued, "[T]here's times when—when my blood sugar runs low that I kind of lose track of myself." Defendant asserted that when he has low blood sugar, he typically goes to the kitchen to eat, but there were "times that [he] unknowingly went elsewhere." Defendant said the victim had previously told him that he touched her breasts and vagina. When the victim told him that, he "was in disbelief. [He] couldn't understand why [he] would do those things." Defendant said he did not recall molesting the victim.

The victim's father sought a restraining order protecting the victim from defendant. In October 2017, at the restraining order hearing, the victim testified that defendant may not have been conscious when he molested her because he crawled into her room.

5

Dr. Marvin Pietruszka is a board certified specialist in preventative medicine, toxicology, and pathology. Pietruszka met with defendant in January 2019 for one hour. Pietruszka confirmed that defendant has diabetes. Pietruszka explained that some diabetics "may sleep walk or sleep talk or sleep eat or verbalize some sexual terminologies or even participate in sexual activities and not even recall the event. [That activity] relates to the hypoglycemic episode that has caused damage to specific brain centers." Such acts that occur during sleep are parasomnias, which "are true medical conditions." Pietruszka opined that defendant's molestation of the victim was attributable to defendant's diabetes.

Grandmother testified at the trial in the instant case. Grandmother said that, in 2017, the victim said "she wanted to come home," and that the social worker had pressured the victim into accusing defendant and then "twisted [the victim's] words." Additionally, in 2018, the victim told Grandmother that she "want[ed] to come home" and that the social worker had "twisted [her] words." Grandmother opined that defendant would not molest a child. Grandmother was unaware that defendant confessed to consciously molesting the victim on 16 occasions. Upon learning of that confession, Grandmother's opinion remained unchanged.

Mother also testified at the trial. In 2017, the victim told Mother that defendant did not molest her. On a separate occasion, the victim told Mother that the victim's statement about defendant had been misconstrued by law enforcement. Mother denied pressuring the victim to recant, and she denied giving the victim notes. Mother asserted

6

the lock on the victim's bedroom door was added to keep the younger children out of the victim's room.

## DISCUSSION

A.     EXPERT TESTIMONY

1.     *PROCEDURAL HISTORY*

The People moved to exclude the testimony of Dr. Richard A. Leo (Leo), who is a "proponent[] of a 'false confession theory' which postulates that police investigation practices lead to frequent false confessions or that false confessions happen 'all the time.' The defense [moved to introduce] Leo's testimony not to demonstrate [the] confession theory in general, but to directly prove that the defendant's admissions were false." The People asserted the jury did not need an expert to help it judge the credibility of defendant's confession.

The People noted that "defendant does not claim that his admissions were involuntary or otherwise constitutionally defective." In defendant's opposition, he disputed that assertion by the People; he contended, "[D]efendant has maintained his confession was the product of police tactics. This is the exact subject Dr. Leo will be testifying to." Defendant explained that Leo would testify about law enforcement's psychological interrogation techniques and how they can amount to coercion.

Defendant further asserted, "Once a trial judge determines that a confession of a defendant was voluntary, the defendant is entitled to present to the jury all evidence on the issue of voluntariness of the confession," so that the jury may determine what

7

weight to give the confession. Defendant contended he "has a constitutional right to present the testimony of expert witness, Dr. Leo."

The trial court said that, based upon its understanding of the law, "we're boiling it down essentially to a[n Evidence Code section] 352 analysis." The trial court ordered an Evidence Code section 402 hearing for Leo's testimony, in order to aid the court in its application of Evidence Code section 352.

At the hearing, Leo, who is a social psychologist, testified that the deputies who interviewed defendant appeared to have used what he called the Reid method of interrogation, which is "where you isolate somebody, build rapport, accuse them, challenge their denials, confront them with real or fabricated evidence, and try to induce them through minimization and persuasion and rationalization to stop denying and start admitting." Leo contended studies show that people will falsely confess to crimes because it seems like the best option. Leo asserted that his studies indicated most people are unfamiliar with police interrogation techniques and do not understand why a person would falsely confess.

Leo opined that defendant may have been susceptible to giving a false confession. Leo said, "[N]ot being a clinical psychologist, I'm not suggesting I'm making any diagnosis—would be his diabetes, his low blood sugar, his description of hypoglycemia and feelings of loopiness. And for very straightforward reasons, something like that could make somebody—somebody's will weaker and more vulnerable—or I should say susceptible to less likely to resist, less strong-willed, more vulnerable to just making or agreeing to statements that one doesn't know to be true or

8

even knows to be false because they don't have the mental wherewithal because they're out of it, because they can't concentrate. So that's very plausible to me, and that would concern me."

Further, Leo asserted that the investigator who interviewed defendant used a technique known as " 'scripting,' " in which the defendant knows some general information about the crime, but is "pressure[d] to—to adopt a certain account about the number of times he had done this, the reasons why he had done this."

The prosecutor asked Leo, "[H]ave you been made aware of any recantation by the defendant in this case?" Leo responded, "I don't recall." The prosecutor asked if "a diagnosis of diabetes could make a suspect more susceptible" to a false confession. Leo said, "[S]omebody in a diabetic coma or in a hypoglycemic state might be more vulnerable. . . . I want to be very clear that I'm not a clinical expert." Leo stated, "I'm not qualified to make an opinion about the effects of [defendant's] diabetes at the time of his interrogation on his behavior or perceptions."

The trial court tentatively ruled that Leo's testimony would be excluded. Defendant asserted Leo would educate the jury about interrogation techniques and "the concept of false confessions and how they're brought about." Defendant asserted techniques that produce false confessions were used in the instant case, so Leo's testimony would be highly relevant.

The trial court said, "In this case, the defendant's primary defense to—in the interview to the police was an assertion that his diabetic condition prevented him from remembering. Or I'll put it in legal terms. Also forming the specific intent necessary to

9

commit the crimes.  But Dr. Leo was very careful to state that he could not opine as to this defendant's particular mental state resulting from a diabetic condition, diabetic symptoms, hypoglycemic conditions or symptoms either at the time of the offenses or, more importantly, at the time of the interview with the police."

Further, the trial court found important the facts that, during the interview, defendant denied digitally penetrating the victim's vagina and anus, denied ejaculating on the victim or her bed, denied forcing the victim to touch his penis, and denied putting his penis in front of the victim's face.  The trial court said, "[H]is will is not overcome. He clearly delineated boundaries about his behavior."  The trial court concluded that Leo's testimony would be "confusing of the issues and misleading to the jury with respect to what the jury must determine, which is the believability or credibility of all of the witnesses and all of the evidence in the case."

2.    *ANALYSIS*

a.    <u>Right to Present a Complete Defense</u>

Defendant contends the trial court violated his constitutional right to present a complete defense by excluding Leo's testimony concerning false confessions.

" '[T]he routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights.' [Citations.]  This is so because 'only evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense.' "  (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 756.)  We examine whether defendant was wholly precluded from presenting his defense.

Defendant's trial counsel cross-examined a deputy, who was present during defendant's law enforcement interview, about topics including interrogation techniques, whether defendant was pressured to admit guilt, and how deputies avoid false confessions. During closing argument, defendant's trial counsel asserted Pietruszka testified that hypoglycemia "could cause a person [to] admit facts that weren't even true." Further, defendant's trial counsel contended that defendant was not offered any form of sugar during the law enforcement interview and that he was "going through a diabetic episode" during the interview. Defendant's trial counsel asserted the deputies were "going to interview [defendant] until [the deputies] got what [they] wanted, and that's what [they] did." Defendant's trial counsel concluded, "Remember Dr. Pietruszka's testimony and how that negates the required state of mind and what effects that can have on somebody confessing. Remember the coercive techniques that the deputies used when you saw the interrogation that they used to wear [defendant] down." Because defendant's trial counsel presented evidence and argument pertaining to interrogation techniques and the effect that hypoglycemia could have had on defendant's confession, we are not persuaded that defendant was denied his constitutional right to present a defense.

> b. Evidence Code section 352

Next, defendant asserts the trial court erred by excluding Leo's testimony under Evidence Code section 352.

"A trial court has broad discretion to exclude relevant evidence under Evidence Code section 352 'if its probative value is substantially outweighed by the probability

11

that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citations.] Such 'discretion extends to the admission or exclusion of expert testimony.' [Citation.] We review rulings regarding relevancy and Evidence Code section 352 under an abuse of discretion standard." (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.)

In *People v. Linton*, the high court considered whether the trial court erred by excluding Leo's testimony, which the defendant in that case had sought to introduce. (*People v. Linton*, *supra*, 56 Cal.4th at pp. 1179-1181.) The Supreme Court reasoned, "As was his right, defendant did not testify and thus did not deny the truth of his interview statements. There was no other evidence offered that logically called into question the veracity of his admissions." (*Id.* at p. 1181.) The court continued, "Not only was there a dearth of evidence indicating a false admission or confession, a multitude of corroborative evidence had been introduced at the time of the trial court's ruling that suggested defendant's admissions and confession were true." (*Id.* at p. 1182.) The high court concluded, "Under these facts, it fell within the trial court's broad discretion to determine that Dr. Leo's proffered testimony had, at most, minimal probative value, which was substantially outweighed by its likely undue consumption of time." (*Ibid.*)

In the instant case, there is little to indicate defendant's confession was false. Defendant drove himself to the sheriff's station for the interview. Defendant walked through the large sheriff's station to the interview room, which takes "a couple of

12

minutes" because it is a large station. That evidence indicates that defendant was functioning reasonably well prior to the interview.

During the interview, defendant admitted consciously touching the victim's vagina and masturbating while touching the victim. Defendant specified that he molested the victim approximately 16 times and rubbed her vagina on approximately 10 of those occasions. Defendant denied forcing the victim to touch his penis, denied ejaculating on the victim or in her bedroom, and denied digitally penetrating the victim. Defendant admitted preferring pornography of children ages 15 to 16 but denied preferring pornography of children ages 10 to 13. Defendant admitted to looking at pornography online, and said Mother checks his phone because "[s]he saw the sites that [defendant] went to."

Defendant's admissions indicate that defendant recalled specific behavior he engaged in including molesting the victim. Defendant's denials indicate that he was capable of denying that he engaged in certain behavior. Thus, defendant was choosing what to admit and deny, he was not overcome by a hypoglycemic episode or interrogation techniques. In other words, defendant may have diabetes and the interview may have involved certain interrogation techniques, but there is little to suggest those things impacted defendant's answers during the interview. As a result, expert testimony about interrogation tactics had little relevance in this case. In sum, the trial court could reasonably conclude the evidence had little probative value, and, therefore, the trial court did not abuse its discretion in excluding the evidence.

B.       FRESH COMPLAINT DOCTRINE

1.      *PROCEDURAL HISTORY*

The People filed a combined trial brief and motions in limine, in which they asserted the victim's statements to the social worker were "not privileged and thus admissible. Furthermore, the testimony is not . . . made inadmissible by the hearsay rule." When addressing the motions in limine, the trial court asked about the foregoing assertion, saying, "And is this a fresh complaint theory?"

The People assented and asserted the social worker would testify about receiving a referral from the suicide hotline, coordinating with law enforcement, and the victim's statements. As to the victim's statements, the People explained that the social worker would testify about the victim having said that she was molested by defendant, in her bedroom, approximately 14 times over a three-year period.

Defense counsel asserted that "a referral from a suicide hotline is multiple hearsay." The trial court asked if the victim would testify and say, " 'I called a suicide hotline' ", and the People contended "[T]here's a very good chance that she's going to say that." The following exchange occurred:

"The Court: I guess the reason I'm asking that is while I appreciate the precision of your objection, it may be kind of a moot point because the evidence will come out in some other way—or will probably come out in another way. So do you understand my—my point?

"[Defense Counsel]: I understand your point. And I think it will come out that she called a suicide hotline."

14

The trial court concluded, "So, again, in light of all that anticipated testimony, there is little to no prejudice to allow the social worker to explain the source of the referral."

During the prosecutor's direct examination of the social worker, the following exchange occurred:

"[Prosecutor]: Okay. And after that, did she disclose to you the sexual abuse?

"[Social Worker]: Yes. She disclosed that—

"[Defense Counsel]: Objection. Hearsay.

"[Prosecutor]: It's fresh complaint, Your Honor.

"The Court: Pardon me?

"[Prosecutor]: It's fresh complaint.

"The Court: The objection is overruled."

On direct examination, the social worker testified that the victim told the social worker about defendant coming into her bedroom at night and touching her vagina and her breasts. The social worker said the victim "reported he would come into her room anywhere from midnight to about 3:00 a.m." The social worker testified that the victim said the molestations occurred "no more than 15 times." Further, the social worker said the victim reported that the molestations stopped when a lock was placed on the victim's bedroom door.

On cross-examination the following exchanges occurred:

"[Defense Counsel]: Now, you mentioned that she told you that this happened between 12:00 at night and 3:00 in the morning; right?

15

"[Social Worker]:  Yes.

"[Defense Counsel]:  She gave a time?

"[Social Worker]:  Yes."

"[Defense Counsel]:  Okay.  Now, you said that she told you that this happened no more than 15 times?

"[Social Worker]:  Yes."

"[Defense Counsel]:  Did [the victim] provide you with any dates other than a range?

"[Social Worker]:  No.

"[Defense Counsel]:  Did you ask?

"[Social Worker]:  She could only provide the—a range because she did not know exactly what dates.

"[Defense Counsel]:  That's what she told you?

"[Social Worker]:  Yes."

"[Defense Counsel]:  Did you ask her if anybody was present during any of these incidents?

"[Social Worker]:  I did ask where her mother was, and she had said her mom was sleeping during those incidents.  And as far as, you know, everyone else in the home, she indicated she had her own room, so—"

"[Defense Counsel]:  So when you testified that she was forthcoming, she didn't really provide you with many details; right?"

16

"[Social Worker]: She did provide details, but there were things that—I mean, if you're—along these lines that I can't remember if I asked or not. But for someone disclosing the severity of these allegations, she did provide detail as to what occurred to her."

During closing argument, defense counsel asserted, "She was unable to give one single date or close to it of one single event. She was unable to give any specific detail beyond, I think a couple times he touched my boob. He would poke me. Some of the touching she talked about was, on its face, nonsexual. And that he rubbed her vagina, but we don't know how many times." Further, defense counsel argued, "Consider the fact that the details of these supposed incidents are very sketchy." Defense counsel continued, "But she still couldn't give at that time any definite information. She couldn't give any details. She couldn't give a date. Just generic testimony."

2.       *ANALYSIS*

Defendant contends the victim's statements to the social worker about the details of the molestations were not admissible under the fresh complaint doctrine.

Under the fresh complaint doctrine, an out of court statement about a sexual offense "is admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others," e.g., when the complaint was made and whether the statement was voluntarily given. (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.) Thus, a trial court may properly admit evidence of the victim's complaint, if the evidence is "narrowly limited to the fact

17

of, and the circumstances surrounding, her disclosure of the alleged sexual molestation." (*Id.* at p. 750.)

"Of course, in many cases it will be the *defendant* who believes that the particular circumstances under which the victim reported the alleged offense—either promptly after the offense is alleged to have occurred or at some later date—cast doubt upon the veracity of the victim's charge, and the defendant will be entitled to introduce and rely upon such evidence in seeking to undermine the prosecution's case. [Citation.] Indeed, unlike the prosecution, which generally cannot introduce or rely upon the details or substantive content of the victim's complaint, a defendant who believes that the contents of the victim's extrajudicial complaint may be useful to impeach the victim's in-court testimony (or other aspects of the prosecution's case) generally is free to introduce and rely upon the details of such a complaint as a prior inconsistent statement." (*People v. Brown*, *supra*, 8 Cal.4th at p. 762.)

The People assert that one must testify to some details of the offense in order to prove that the out of court complaint pertained to the charged offense. During motions in limine, defendant did not object to the social worker testifying about the victim's statements. Rather, defense counsel objected to the social worker testifying about the referral from the suicide hotline. However, during trial, defense counsel objected when the social worker was about to describe the victim's statements. When defense counsel cross-examined the social worker, he elicited as many, if not more, details about the victim's statements than the prosecutor elicited. Because defense counsel initially did not object, then did object, then asked for as many details as the prosecutor, it is

18

difficult to determine whether it was defense counsel's plan to ask about the alleged lack of detail in the victim's statements or whether he was compelled to do so due to the overruling of his objection during trial.

We will give defendant the benefit of the doubt and assume that defendant would have preferred to have the details of the victim's statements to the social worker excluded. For the sake of judicial efficiency, we will treat this issue as though the trial court erred by allowing the social worker to testify to an excessive amount of details from the victim's out of court statements.

"We review evidentiary errors for prejudice by determining whether it was reasonably probable that a jury would have returned a more favorable verdict for defendant had the court not admitted the evidence." (*People v. Felix* (2019) 41 Cal.App.5th 177, 187.) Defendant admitted to law enforcement that he consciously molested the victim 16 times and that on 10 of those occasions he rubbed the victim's vagina.

The jury found defendant guilty on all 14 counts of committing a lewd or lascivious act upon a child under the age of 14 years old. (§ 288, subd. (a).) The jury found true the allegations that, for 10 of the counts, defendant engaged in substantial sexual conduct with the victim (§ 1203.066, subd. (a)(8)), but the jury found that same allegation untrue for the other four counts. Because the jury found substantial sexual conduct on only 10 of the 14 counts, it appears the jury credited defendant's confession that he molested the victim 16 times and rubbed her vagina on 10 of those occasions. Because the jury credited defendant's confession, it is not reasonably probable that the

19

jury would have returned a more favorable verdict had the social worker not testified about the details of the victim's out of court statements. Therefore, even if we assume the trial court erred, the error is harmless.

C. CSAAS

1. PROCEDURAL HISTORY

The People moved in limine to present evidence of CSAAS. The People asserted Dr. Veronica Thomas (Thomas), a forensic psychologist, would "testify generally in order to educate the jury on . . . how a child molestation victim would delay in reporting, never report at all, or recant the accusation." The People contended the evidence "is relevant simply because it goes to the credibility of the victim in this case." The People contended the average juror would not have an understanding of how children react to being molested.

Defendant moved in limine to exclude evidence of CSAAS. First, defendant asserted that, in general, CSAAS should "be deemed to be inadmissible as improper, irrelevant expert opinion which usurps the jury's function to determine credibility." Second, defendant contended that "the subjects [CSAAS] addresses [are] within the common knowledge of the typical juror."

The trial court denied defendant's motion, finding that "the testimony is relevant to educate the jury on an area which is not subject to—to a common person's understanding, and therefore it may be used in [the People's] case in chief." Thomas testified about CSAAS. The prosecutor then posed hypothetical questions that related to the facts of the case. For example, the prosecutor asked, "Let's assume that a

victim discloses to her mother and to law enforcement . . . . The mother tells the victim, 'You are the reason that our family is split up.' Given those facts, would it surprise you if there was then later a recanting statement?" Thomas responded, "That wouldn't be a surprise at all."

### 2. *ANALYSIS*

Defendant raises three arguments as to why the trial court erred by admitting the CSAAS evidence. First, defendant contends the trial court erred because CSAAS evidence should be excluded in all cases because it is a biased theory that "will always support the conclusion the abuse actually occurred." Second, defendant asserts the CSAAS evidence should have been excluded because the jurors' answers during voir dire indicated they did not have preconceived ideas about the reactions of molestation victims. Third, defendant contends the CSAAS evidence should have been excluded because the prosecutor's hypothetical questions were so close to the facts of the instant case that Thomas effectively testified about whether the victim was molested.

As to all of these issues, if we were to conclude that the trial court erred by admitting the CSAAS evidence, we would find such an error harmless. The error would be harmless because the jury's verdict that defendant molested the victim 14 times, but only 10 of those occasions involved substantial sexual conduct, mirrors defendant's confession that he molested the victim 16 times and rubbed her vagina on 10 of those occasions Because the jury credited defendant's confession, it is not reasonably probable that a result more favorable to defendant would have occurred if the CSAAS evidence had been excluded.

21

### D. VICTIM'S MOTIVES

#### 1. *PROCEDURAL HISTORY*

In a motion, defendant asserted that, prior to the victim making allegations against defendant, the victim told her "family that she is a lesbian, which was not accepted by the family favorably." Further, defendant contended the victim contacted the suicide hotline due to an argument with defendant—not to discuss molestation—and the subject of molestation never arose during the conversation with the suicide hotline. Defendant asserted, "[The victim's] revelation of her sexual orientation and subsequent therapy are relevant on the issues of motive to fabricate, credibility, and conduct inconsistent with being molested as well." The People opposed the motion asserting, under Evidence Code section 352, "[The victim's] sexual orientation and her psychological history are not relevant to her credibility related to the charges in the instant matter."

At the hearing on the motion, the trial court asked defendant's trial counsel how the evidence was relevant to the victim's credibility or her bias against defendant. Defendant's trial counsel asserted the victim retaliated against defendant due to his reaction to her sexual orientation or to try to put the family's focus on an issue other than her sexual orientation. In response, the prosecutor asserted there was no evidence to support such a theory. The prosecutor contended the evidence reflected that, prior to the victim contacting the suicide hotline, there had been an argument about "who was sitting where" on the sofa. Defense counsel asserted the argument about seating on the sofa was part of a larger issue.

22

The trial court excluded the evidence under Evidence Code section 352, concluding that "an inquiry into the [victim's] sexual orientation would confuse the issues and mislead the jury as to the relevant issues here." The trial court asserted that defendant's theory of the case was that he lacked "the necessary mental state[] to commit the acts alleged . . . based on his medical condition." Defendant's trial counsel asserted that another point he would argue is "the credibility and motives of the [victim]." The trial court said it was aware of that intended point, but that inquiring into the victim's sexual orientation would create confusion and mislead the jury. The trial court denied the motion.

During the trial, the victim testified that she suffers from anxiety and went to a therapist. Grandmother testified, "Apparently, [the victim] was also seeing a doctor, a psychologist, psychiatrist, and she said they were basically telling her what went on and what to say and how to change her words."

2.  *ANALYSIS*

Defendant contends the trial court violated his rights of due process and confrontation by precluding him from questioning the victim about her family's negative reaction to her disclosure of her sexual orientation and her subsequent mental health.

"The rights to confront and cross-examine witnesses and to call witnesses [o]n one's own behalf have long been recognized as essential to due process." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 294.) "Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other

23

legitimate interests in the criminal trial process." (*Id.* at p. 295.) "In particular, notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352. [Citation.] A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.)

The victim's credibility was impeached in a variety of ways. The victim testified that her family did not believe her allegations. Mother and Grandmother testified about the victim's four out of court statements in which the victim recanted and said the social worker and law enforcement misconstrued her statements. Mother testified that the victim shoplifted multiple times. Thus, there was a variety of evidence from which the jury could conclude the victim lacked credibility.

In terms of a motive to lie, there was evidence that the victim "had a big argument" with defendant about a seat on the sofa, which resulted in the victim "storm[ing] out of the living room." The victim described that argument as the "last straw," which one could conclude indicated a troubled relationship. Thus, there was evidence from which one could argue the victim disliked defendant.

In sum, there was evidence tarnishing the victim's credibility and evidence of the victim's motive to fabricate the allegations. Given that such evidence was presented, we conclude the jury would not have had a significantly different impression of the victim's credibility had the victim's sexual orientation and further details of her mental

health been admitted.  (*People v. Quartermain*, *supra*, 16 Cal.4th at pp. 623-624.)

Therefore, the limitation on cross-examination did not violate the confrontation clause.

      E.      <u>CUMULATIVE ERROR</u>

Defendant contends the cumulative effect of the foregoing alleged errors requires reversal of the judgment.  For the sake of judicial efficiency we treated two of the issues as though the trial court erred.  As explained *ante*, it can be concluded from the jury's verdicts that they credited defendant's confession.  Therefore, if the social worker's testimony about the victim's extrajudicial statements had been excluded and if the CSAAS evidence had been excluded, it is not reasonably probable that a result more favorable to defendant would have occurred.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

                                   MILLER                           

                                                     J.

We concur:

<u>McKINSTER</u>                  
                     Acting P. J.

<u>FIELDS</u>                       
                    J.