Filed 3/20/23  P. v. Morales CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PEDRO ACEVEDO MORALES,<br><br>    Defendant and Appellant. | 2d Crim. No. B318720<br>(Super. Ct. No. 2018033565)<br>(Ventura County) |

Pedro Acevedo Morales[1] appeals from the judgment after the jury convicted him of four counts of forcible lewd acts upon a child under the age of 14 pursuant to Penal Code[2] section 288, subdivision (b)(1) (counts 1-4) and four counts of lewd acts upon a

---

[1] There is a discrepancy in the record on whether appellant's legal name is Pedro Acevedo Morales or Pedro Morales Acevedo.  For the purposes of this opinion, we will refer to appellant as Acevedo.

[2] Further unspecified statutory references are to the Penal Code.

child pursuant to section 288, subdivision (a) (counts 5-8). All acts were alleged against L.H. The trial court sentenced Acevedo to 20 years in state prison.

Acevedo contends (1) there was insufficient evidence the offenses occurred between June 1, 2012 and September 30, 2012 and that L.H. was under the age of 14 at the time of the acts; (2) the prosecutor committed misconduct during closing argument; (3) the trial court abused its discretion in allowing expert testimony on child sexual abuse accommodation syndrome (CSAAS); and (4) the court erred in admitting evidence of L.H.'s partial disclosure to her high school friend. We affirm.

FACTS AND PROCEDURAL HISTORY

*Prosecution evidence*

L.H. was born in November 1999. In the summer of 2012, she was in junior high and lived in a house in Oxnard with her parents and brothers. Acevedo and his uncle lived with L.H. and her family during the summer of 2012. L.H. was on break from school and was often at home alone with Acevedo and her siblings while her parents were at work.

At the beginning of the summer, Acevedo and L.H. had "pretty normal" interactions, but he soon began winking and smirking at her and making uncomfortable comments. He would also caress her back while talking to her. During the rest of the summer, Acevedo sexually molested L.H. on at least eight of the following instances:

*1. Count 1*

One evening, L.H. left her room to get water from the kitchen. Acevedo grabbed L.H. from behind and "forcibly press[ed] his penis" against her back. He fondled her breasts and kissed her neck and ear. He led her towards the couch, laid on top of her, lifted her shirt, and touched and kissed her breasts,

2

neck, face, and stomach.  He unzipped her pants and touched her vagina over her underwear.  L.H. told him to stop, but he did not stop.  The incident lasted about ten minutes.  She was scared.  When it was over, he told her not to tell her parents and that her parents would not believe her.

### 2. *Count 2*

L.H. recalled an incident when Acevedo was sitting at the dinner table when she walked past him.  He said to her: "Hey, come over here," but she tried to walk away.  He grabbed her by the arm, pulled her close to him, and put her in between his legs while he remained seated in his chair.  He caressed her back and butt, grabbed her waist, and made her sit on his lap facing away from him so that her "butt was on his penis."  He then caressed her thighs and legs, kissed her neck and ears, and touched her over and under her shirt.

### 3. *Count 3*

L.H. testified there were three instances when Acevedo "corner[ed]" her and kissed her body.  He pushed her to the corner of the living room near the bookshelves, kissed her neck, and touched her vagina over her pants with one hand.  He held her with his other hand.

### 4. *Count 4*

L.H. said there were several instances when she sat next to Acevedo on the living room couch, and he touched her thighs and caressed them.  L.H. said some instances occurred in August when her junior high school was back in session, and she recalled being in her school uniform when he touched her.  On some occasions, he would grab her hand and make her touch his penis over his pants.  He would "lead [her] hand to touch" his penis until he had an erection.  The touching would be "on and off," lasting around 30 minutes.

### 5. *Count 5*

L.H. testified that one day, Acevedo grabbed her by the hands and held them behind her back. He then kissed her on her face and neck and touched her vagina over her pants.

### 6. *Count 6*

L.H. recalled an instance when she was cleaning the living room and Acevedo approached her from behind and "grind[ed] himself" on top of her. He rubbed his penis on top of her back, and she felt him getting an erection. He grabbed her with his arms and hugged her as he did this. The incident lasted "a couple of minutes."

### 7. *Count 7*

L.H. said there were several occasions when Acevedo touched her breasts while she sat on the couch. He touched her both over and under her clothing.

### 8. *Count 8*

L.H. testified there were multiple occasions where Acevedo "smack[ed] [her] butt." She said he would "sneak up" on her when there was no one else in the room.

*L.H. disclosures and investigation*

L.H. said Acevedo threatened her to dissuade her from reporting these acts of molestation. He told her that nobody would believe her because she was "a little girl and was not even a woman" and that he would hurt her family. He also told her if she ever told her parents, he would "report them to the police and deport them." L.H. did not tell her parents what happened during the summer. She said she did not report to the police earlier because she "still feel[s] like it was [her] fault" and because she did not think people would believe her. She also said it "hurt [her] to talk about it" and at that time she "couldn't live with the fact that somebody would get punished."

4

While in high school, L.H. told her friend, K.R., about some of the molestation that occurred in summer 2012. L.H. testified she told K.R. that a man who used to live with her family "would touch [her] inappropriately" and looked at her in a "strange way." She did not go into detail.

K.R. testified L.H. told her the man who rented a room in her family's house made her feel "very uncomfortable in the way that he would look at her" and by "some things that he would say to her." K.R. said "when [L.H.] told me that, she started crying, so I don't think she finished telling me everything."

L.H. graduated high school in summer 2017 and left for college in August 2017. Acevedo contacted L.H. through Facebook Messenger during her senior year in high school. They continued communications "off and on" through her college years. L.H. said she communicated with Acevedo because she was scared he would talk to her parents and because she thought he cared about her. At the time, L.H. "felt like [she] was the problem" and blamed herself for seducing or provoking him.

In 2018, L.H. reported Acevedo to the Oxnard Police Department. L.H. testified she decided to do so because she was feeling conflicted, was taking classes about child development, and was scared he might abuse other young girls or his own daughter.

Before L.H. went to college, she became a recipient of the Deferred Action for Childhood Arrivals (DACA) program, which protected her from deportation. DACA was rescinded in September 2017, and in January 2018, a Northern District of California federal court issued a stay of the rescission. When L.H. reported Acevedo to the police, she applied for a U-Visa, which provides immigration relief for undocumented persons who suffered substantial physical or mental abuse due to being a

victim of certain crimes in the United States.[3]  She asked the investigating police officer for assistance with her U-Visa application, and applied based on the allegations she made against Acevedo.

L.H. agreed to help law enforcement by making a pretext call to Acevedo.  During the call, Acevedo made several incriminating statements, including that he was afraid his wife would hate him if she found out what he did to L.H. and that "what happened wasn't right" because she was "still a little girl." Nor did Acevedo deny L.H.'s references to the specific sex acts he committed against her when she was a child.

*CSAAS expert*

Clinical psychologist Dr. Anthony Urquiza testified as an expert in child sexual abuse.  He did not know the parties or the facts of the case.  He testified about CSAAS, children's common responses to sexual abuse, and the misperceptions or myths about child abuse.  He testified that most children of abuse are sexually abused by someone with whom they have an ongoing relationship and there is a power imbalance between the perpetrator and the victim.

Dr. Urquiza testified there are five stages of CSAAS: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed and unconvincing disclosure, and (5) retraction and recantation.  With respect to the "secrecy" stage, Dr. Urquiza explained that children often keep quiet about sexual abuse because they are threatened or intimidated by their perpetrator. At times, the perpetrator gives special attention to the victim in exchange for a close relationship, and the victim "get[s] stuck into this double life where they may like or . . . love the person who's

---

[3] See 8 U.S.C. § 1101, subd. (a)(15)(U).)

6

abusing them, but they don't want a bad thing to happen to that person." With respect to the "delayed and unconvincing disclosure" stage, Dr. Urquiza testified delay is "a very common response to being sexually abused" and "one of the more common characteristics . . . is that it may take months or years for them to disclose from the very, very first time it happens to the first time they're able to tell anybody about what happened." He also testified the first disclosure "may not be a fully articulated, clear, comprehensive description of what happened," and if a child had been abused several times, a child's ability to describe certain details or recite events in chronological order would be difficult.

*Verdict and sentencing*

The jury found Acevedo guilty of all eight counts of lewd acts (§ 288, subds. (a) & (b)(1)) and found the special allegation of substantial sexual conduct (§ 1203.066, subd. (a)(8)) on count 4 true. Acevedo was sentenced to 20 years in state prison (consecutive 5 years for each counts 1-4 and concurrent 3 years for each counts 5-8).

DISCUSSION

*Sufficiency of evidence*

Acevedo argues the evidence was insufficient to establish the offenses occurred between June 1, 2012, and September 30, 2012 (summer 2012). He points to evidence showing the discrepancy in L.H.'s age. The Attorney General argues the date of offense is immaterial because it was not an element of the crime, nor did the defense raise an alibi or statute of limitations defense where the date of the offense was relevant. We agree with the Attorney General.

"The precise time at which the offense was committed need not be stated in the accusatory pleading, but it may be alleged to have been committed at any time before the finding or filing

7

thereof, except where the time is a material ingredient in the offense." (§ 955.) " 'The law is clear that, when it is charged that an offense was committed "on or about" a named date, the exact date need not be proved unless the time "is a material ingredient in the offense" [citation], and the evidence is not insufficient merely because it shows that the offense was committed on another date.' [Citations.]" (*People v. Garcia* (2016) 247 Cal.App.4th 1013, 1022.)

*People v. Peyton* (2009) 176 Cal.App.4th 642 is instructive. There, the defendant argued there was insufficient evidence he sexually abused the victim as charged because the information alleged each offense occurred " 'on or about October 1, 2005.' " (*Id*. at p. 660.) The evidence at trial, however, showed the crimes occurred in the fall of 2004 when the defendant was living with the victim, and the evidence "clearly showed" the defendant had moved out of the victim's home before October 2005. (*Ibid*.) The Court of Appeal rejected the defendant's claim, reasoning the October 2005 date was "not material to any of the charged offenses. Nor has defendant shown he was prejudiced by the variance between the October 1, 2005 date" as set forth in the information and the evidence at trial that the offenses occurred a year earlier. (*Id*. at pp. 660-661.) The prosecution was not required to show the crimes took place on or about October 2005, "but only 'reasonably close to [that day].' " (*Id*. at p. 660.)

Whether the offenses occurred in the summer of 2012 or 2013 was not a "material ingredient" in the alleged offenses. (§ 955). Nor has Acevedo shown how the discrepancy of the date range prejudiced him. In any event, substantial evidence supports a finding the offenses occurred in the summer of 2012. In reviewing a claim of sufficiency of evidence, we determine whether a rational trier of fact could find the defendant guilty

8

beyond a reasonable doubt. We view the evidence in the light most favorable to the prevailing party and presume in support of the judgment every fact the trier could reasonably deduce from the evidence. (*People v. Jones* (1990) 51 Cal.3d 294, 314 (*Jones*).) The testimony of a single witness is sufficient to support a conviction. (*People v. Scott* (1978) 21 Cal.3d 284, 296.)

L.H. testified the offenses occurred during the summer of 2012 when Acevedo was living with her family. Moreover, she testified he lived with her family through the "early semester [of] junior high," and one incident occurred after she had returned to junior high school from summer break. Since L.H. entered high school after the summer of 2013, her testimony that the abuse continued through the early semester of junior high school was consistent with the offenses occurring between June and September 2012.

In arguing there was insufficient evidence, Acevedo points to conflicting evidence: L.H. testified several times that she was 13 years old at the time of the offenses; that she was 13 years old throughout the investigation; and that her youngest brother was "small" at the time of the offenses, even though he was born in October 2013. Acevedo also points to the prosecution attempting to amend the information after the close of evidence to reflect that the offense occurred a year later (between June 1, 2013 and September 30, 2013). Despite these discrepancies, our review on appeal is substantial evidence, which requires us to construe the evidence in a light favorable to the prevailing party—not the other way around. (*Jones, supra*, 51 Cal.3d at p. 314.) That some evidence could have supported a contrary finding does not warrant reversal. (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

Moreover, the jury was aware of the discrepancies between the alleged dates of the offenses and the testimony regarding

9

L.H.'s age. The jury was instructed that it "must decide what the facts are" and that it alone must "decide what the facts are . . . based only on the evidence that has been presented to you." The court also instructed that the prosecution must prove the crimes "happened within the timeframe given of June 1, 2012 through September 30, 2012." We presume the jury followed the instructions. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30 (*Chhoun*).) It is the "exclusive province" of the jury to determine "the truth or falsity of the facts" upon which its determination depends. (*Jones*, *supra*, 51 Cal.3d 294, 314.) "Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*Ibid*.) We conclude the evidence was sufficient to prove the offenses occurred between June and September of 2012.

Acevedo also contends his convictions must be reversed because there was insufficient evidence L.H. was younger than 14 years old at the time the offenses occurred. This contention lacks merit. The offenses occurred in the summer of 2012 when L.H. was in junior high school and under the age of 14. L.H.'s mother also testified the family lived in the Oxnard house, where the abuse occurred, from 2011 to 2013. L.H. would have turned 14 in November of 2013. And although there was some conflicting testimony regarding L.H.'s exact age at the time of the acts, L.H. consistently maintained she was younger than 14 years old (i.e., she testified she was 13 years old at the time of the offenses). There is substantial evidence L.H. was under the age of 14 when Acevedo molested her.

*Prosecutor's statements during closing argument*

During closing argument, the prosecutor made the following statements to the jury: "When you talk about

10

reasonable doubt, you have to have an abiding conviction that the charge is true, right. So when you go in the back, you deliberate, you fill out your form, you go on your way for the holidays, can you go to sleep at night that it was right?"

Acevedo argues the statements amounted to prosecutorial misconduct which could not be remedied by a curative instruction. The Attorney General contends Acevedo forfeited his claim because he did not object at trial. We agree the claim is forfeited. (*People v. Powell* (2018) 6 Cal.5th 136, 171.) " 'To preserve such a claim for appeal, "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard impropriety." ' [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm." (*Ibid.*) We agree with the Attorney General that Acevedo should have timely objected and requested a curative instruction.

But even if he had objected, Acevedo's contention lacks merit. The jury was properly instructed that its verdict must be based on the evidence, the prosecution must prove Acevedo's guilt beyond a reasonable doubt, and proof beyond a reasonable doubt meant "proof that leaves you with an abiding conviction that the charge is true." The court also instructed that if an attorney's comments on the law conflict with the court's instructions, then the jury must follow the court's instructions. We presume the jury followed the instructions. (*Chhoun*, *supra*, 11 Cal.5th at p. 30.)

*Expert testimony*

Acevedo argues the trial court abused its discretion when it allowed expert testimony on CSAAS because such testimony was unnecessary as "there were straightforward explanations for why

11

[L.H.] did not report the abuse at or near the time that it occurred." He asserts the delay in reporting was "easily understood and explained by [L.H.]'s testimony that defendant threatened to have her parents deported if she reported the abuse."

Evidence Code section 801, subdivision (a) permits expert opinion related "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." A " 'jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).) Expert opinion testimony is properly excluded only when it " 'add[s] nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that [persons] of ordinary education could reach a conclusion as intelligently as the witness." ' [Citation.]" We review a trial court's admission of expert testimony for abuse of discretion. (*Ibid.*)

Expert testimony on CSAAS may be admissible to dispel misconceptions about child sexual abuse and to explain common stress reactions of child victims, including a child's failure or delay in reporting abuse. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301; *People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*).) The expert testimony is not admissible to prove a child has in fact been sexually abused, but it "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with [their] testimony claiming molestation." (*McAlpin*, *supra*, at p. 1300.)

There was no abuse of discretion here. The CSAAS evidence was properly admitted to assist the jury to understand

12

L.H.'s behaviors and reaction to the abuse, including her delay in reporting. L.H. testified there were multiple reasons she did not disclose the abuse at an earlier time. She testified Acevedo threatened to deport her parents, but in addition, she said she blamed herself, she thought no one would believe her, it hurt to talk about the abuse, and she "couldn't live with the fact that somebody would get punished." L.H. also testified that she continued to communicate with Acevedo while she was in college because she was scared he would tell her parents and she thought he cared about her. The CSAAS evidence was relevant to explain that a child abuse victim often fails to disclose or delays disclosure for a variety of reasons, such as feeling threatened or intimated by their perpetrator, or feeling conflicted because "they don't want a bad thing to happen to that person."

Acevedo also argues the admission of CSAAS testimony was cumulative, would confuse the jury, and was unduly prejudicial pursuant to Evidence Code section 352. His argument lacks merit.

A court may exclude evidence if its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The probative value of Dr. Urquiza's testimony outweighed any prejudice. The testimony was probative to explain reasons for L.H.'s delayed disclosure. It was especially relevant because of the defense's argument that the timing of L.H.'s reporting, over five years after the abuse occurred, was suspicious given her precarious immigration status and efforts to obtain a U-Visa.

Dr. Urquiza's testimony was not unduly prejudicial because he limited his testimony to general CSAAS and child sexual

13

abuse concepts without reference to any specific allegations in this case.  He also testified that he did not know the parties or the facts of this case.  (*Munch, supra*, 52 Cal.App.5th at p. 475.)  Moreover, the trial court instructed the jurors that the CSAAS testimony was " 'not evidence in any way that the defendant committed any of the crimes charged against him' " and that the limited purpose of the evidence was to assist the jury "in deciding whether or not an alleged victim's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."  We presume the jury followed the instructions.  (*Ibid.*; *Chhoun, supra*, 11 Cal.5th at p. 30.)

*Evidence of L.H.'s disclosure to K.R.*

Acevedo contends the trial court erred when it admitted K.R.'s testimony regarding L.H.'s disclosure under the "fresh complaint" doctrine.  There was no error.

Under the fresh complaint doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750 (*Brown*).)  "Evidence admitted pursuant to this doctrine may be considered by the trier of fact for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime.  (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522.)  We review for abuse of discretion.  (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

The trial court did not abuse its discretion in admitting K.R.'s testimony under the fresh complaint doctrine. "[W]hen the victim of an alleged sexual offense did not make a prompt complaint but instead disclosed the alleged incident only some time later, evidence of the fact and circumstances surrounding the delayed complaint also may be relevant to the jury's evaluation of the likelihood that the offense did or did not occur." (*Brown, supra,* 8 Cal.4th at p. 761.) Here, the fact that L.H. made a partial disclosure to K.R. was relevant because it corroborated L.H.'s testimony and refuted the defense's argument that she lied about the abuse to secure her immigration status.

Acevedo argues K.R.'s testimony should have been excluded because L.H.'s disclosure "do[es] not allege a sexual assault, they were not made near in time to the alleged assaults, nor do they identify defendant." We are not persuaded. L.H. testified she told K.R. that a man who used to live with her family "would touch [her] inappropriately." The fact that L.H. did not specify the sexual assault or defendant's identity does not render the statement inadmissible. The limited purpose of such evidence under the fresh complaint doctrine is to establish the fact of, and the circumstances surrounding, the victim's disclosure to another person, and not to prove the alleged sexual act occurred. (*Brown, supra,* 8 Cal.4th at pp. 749-750.) Thus, it is the fact that L.H. disclosed to her friend and not the specificity of her disclosure that is relevant.

And contrary to Acevedo's argument, the court did not abuse its discretion in not excluding K.R.'s testimony pursuant to Evidence Code section 352. This evidence was relevant to L.H.'s credibility, which was challenged by the defense's argument that she reported for the purpose of obtaining her U-Visa. The evidence was also probative to explain the delay in disclosing to

15

law enforcement.  The risk of undue prejudice or misleading the jury was minimal because K.R.'s statements were brief and did not describe any sexual abuse in detail.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

GILBERT, P. J.

YEGAN, J.

16

Anthony J. Sabo, Judge

Superior Court County of Ventura

_____

Law Offices of Scott H. Bentley and Scott H. Bentley for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.